# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE COLUMBIA PIPELINE GROUP, INC. MERGER LITIGATION | ) ) | Cons. C.A. No. 2018-0484-JTL |

## MEMORANDUM OPINION

Date Submitted: December 4, 2020
Date Decided: March 1, 2021

Ned Weinberger, Derrick Farrell, LABATON SUCHAROW LLP, Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Stephen E. Jenkins, Marie M. Degnan, ASHBY & GEDDES, P.A, Wilmington, Delaware; Jeroen van Kwawegen, Christopher J. Orrico, Alla Zayenchik, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Attorneys for Plaintiffs.*

Martin S. Lessner, James M. Yoch, Jr., Paul J. Loughman, Kevin P. Rickert, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Brian J. Massengill, Matthew C. Sostrin, Linda X. Shi, MAYER BROWN LLP, Chicago, Illinois; *Attorneys for Defendants.*

**LASTER, V.C.**

The plaintiffs are former stockholders of Columbia Pipeline Group, Inc. ("Columbia" or the "Company"). On July 1, 2016, TransCanada Corporation acquired the Company (the "Merger") under an agreement and plan of merger dated March 17, 2016 (the "Merger Agreement" or "MA"). Each share of Columbia common stock was converted into the right to receive $25.50 in cash, subject to each stockholder's right to eschew the consideration and seek appraisal.

During the sale process, Robert Skaggs, Jr., served as the Company's Chief Executive Officer and as chairman of its board of directors (the "Board"). Steven Smith served as the Company's Executive Vice President and Chief Financial Officer. The plaintiffs contend that Skaggs and Smith wanted to retire in 2016 and engineered a sale of the Company so that they would receive their change-in-control benefits. The plaintiffs contend that once TransCanada emerged as a committed bidder, Skaggs and Smith persistently favored TransCanada during the sale process. The plaintiffs detail a series of actions that Skaggs and Smith took which inferably undercut the Company's bargaining leverage with TransCanada and prevented the Company from developing other transactional alternatives. As a result, during the final phases of the negotiations, TransCanada was able to lower its bid below the range it had offered to obtain exclusivity, demand an answer within three days, and threaten to announce publicly that merger negotiations had terminated unless the Company accepted the lowered bid. Faced with the bad situation that Smith and Skaggs had created, the Board entered into the Merger Agreement.

1

The plaintiffs contend that by taking these actions, Skaggs and Smith breached their fiduciary duties. The plaintiffs contend that TransCanada knew that Skaggs and Smith were breaching their duties, in part because their actions were so extreme, and exploited the resulting opportunity, making TransCanada potentially liable for aiding and abetting the breaches.

The defendants point out that this is the fourth lawsuit arising out of the Merger. Immediately after the Merger was announced, a group of traditional stockholder plaintiffs attacked the deal in this court (the "Original Fiduciary Action"). The defendants prevailed on a motion to dismiss.

Next, a group of hedge funds pursued their appraisal rights (the "Appraisal Proceeding"). That case was litigated through trial, resulting in a decision holding that the Company's fair value for purposes of appraisal was equal to the deal price of $25.50 per share (the "Appraisal Decision").

While the Appraisal Proceeding was moving forward, the plaintiffs in this action filed suit, relying on discovery from the Appraisal Proceeding that had become publicly available. The plaintiffs in this action sought to consolidate this litigation with the Appraisal Proceeding and to have a single trial on all issues, but TransCanada—the real part in interest in the Appraisal Proceeding—successfully opposed that result. This action then lay dormant until after the issuance of the Appraisal Decision.

Finally, while the Appraisal Proceeding was moving forward, two other stockholders filed an action in federal court that asserted claims under the federal securities laws (the "Federal Securities Action"). The plaintiffs in the Federal Securities Action also

asserted claims under Delaware law for breach of the fiduciary duty of disclosure. The defendants prevailed on a motion to dismiss, but the federal court declined to reach the claims for breach of fiduciary duty (the "Federal Securities Decision").

Now, the plaintiffs in this action wish to proceed with their litigation. The defendants have moved to dismiss the complaint, arguing that the Appraisal Decision and the Federal Securities Decision mandate dismissal under principles of collateral estoppel. The defendants understandably want those prior rulings to be binding, but the current plaintiffs do not have a relationship with either the petitioners in the Appraisal Proceeding or the plaintiffs in the Federal Securities Action that would support the application of issue preclusion.

As a fallback, the defendants maintain that dismissal is warranted under the doctrine of *stare decisis* because the Appraisal Decision and the Federal Securities Decision are persuasive authorities that ruled on the issues presented in this case. Unfortunately for the defendants, the Appraisal Decision addressed a narrow question: the fair value of the Company as a standalone entity operating as a going concern. The Appraisal Decision held that the sale process was sufficiently reliable that the deal price provided a sound indication of the Company's standalone value. The Appraisal Decision did not determine whether Skaggs and Smith breached their fiduciary duties, nor did it address the claim that the Company could have obtained a higher deal price from TransCanada or from a competing bidder if Skaggs and Smith had not acted as they did. The rulings in the Federal Securities Decision likewise do not translate to the current setting, because the district court applied

3

the higher federal pleading standard of plausibility to address claims under the federal securities laws that required the pleading of particularized facts.

The allegations of the complaint support a reasonably conceivable inference that Skaggs and Smith breached their duty of loyalty. Although the allegations against TransCanada are weaker, they support a reasonably conceivable inference that TransCanada aided and abetted breaches of fiduciary duty by Skaggs and Smith. The defendants' motion to dismiss is denied.

## I. FACTUAL BACKGROUND

The facts are drawn from the amended complaint (the "Complaint"), the documents that it incorporates by reference, and pertinent public records that are subject to judicial notice.[1] At this procedural stage, the Complaint's allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences.

### A. The Company

At the time of the events giving rise to the Complaint, Columbia was a Delaware corporation headquartered in Houston, Texas. The Company developed, owned, and operated natural gas pipeline, storage, and other midstream assets. As a midstream company, Columbia's operations centered on the transportation and storage of oil and

---

[1] *See* D.R.E. 201(b); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 585 (Del. Ch. 2007) (noting that D.R.E. 201 permits a court to take judicial notice of "documents [outside the pleadings] that are required by law to be filed, and are actually filed, with federal or state officials"); *In re Wheelabrator Techs., Inc. S'holders Litig.*, 1992 WL 212595, at *11–12 (Del. Ch. Sept. 1, 1992) (taking judicial notice of publicly filed documents for purposes of motion to dismiss).

4

natural gas. The Company's success depended on its contracts with oil and gas producers, known as counterparty agreements.

Columbia's primary operating asset consisted of 15,000 miles of interstate gas pipelines that served the strategically important Marcellus and Utica natural gas basins in Appalachia. The Company's management team had developed a growth-oriented business plan that sought to exploit a production boom in the basins. The plan required substantial capital investment, which in turn required large amounts of financing.

Columbia itself was a holding company. Its principal asset was an 84.3% interest in the Columbia OpCo LP ("OpCo"), a Delaware limited partnership that owned the Company's operating assets. Columbia also owned 100% of the general partner interest and 46.5% of the limited partner interest in Columbia Pipeline Partners, L.P. ("CPPL"), a master limited partnership ("MLP") whose common units traded on the New York Stock Exchange. CPPL owned the other 15.7% interest in OpCo.

The Company used CPPL to raise capital. As a pass-through entity, CPPL could raise funds at a lower cost of capital than the Company. CPPL raised capital by selling limited partner interests to the public. For CPPL to raise capital efficiently, the trading price of CPPL's units needed to remain in line with management's projections.

**B.    NiSource**

Before the events challenged in the Complaint, Columbia was a wholly owned subsidiary of NiSource Inc., a publicly traded utility headquartered in Indiana. Skaggs was the CEO of NiSource and chairman of its board of directors. Smith was its CFO.

5

Skaggs and Smith had been planning for retirement, and both had selected 2016 as their target year. Skaggs had served as CEO since 2005, and he believed that a CEO had a "shelf-life" of about ten years. Compl. ¶ 27. Skaggs' personal financial advisor used March 31, 2016, as Skaggs' anticipated retirement date for planning purposes. He told Skaggs that "the single greatest risk" to the retirement plan was Skaggs' "single company stock position in NiSource." *Id.* ¶ 28. Smith considered fifty-five to be the "magical age" to retire. *Id.* ¶ 29. He would turn fifty-five in 2016.

Skaggs and Smith enjoyed compensation packages that included lucrative change-in-control arrangements. Those arrangements would provide materially greater benefits if their employment ended after a sale of NiSource. A sale of assets comprising more than 50% of NiSource's book value satisfied the requirement for a sale. The midstream assets that NiSource held through the Company comprised less than 50% of NiSource's book value, so a sale of the Company by NiSource would not trigger the change-in-control benefits. But if NiSource spun off the Company and if Skaggs and Smith became executives of the Company with similar change-in-control arrangements, then a sale of the Company would trigger their benefits.

C.    The Spinoff

In September 2014, NiSource announced that it would spin off the Company. NiSource also announced the formation of CPPL as the primary funding source for the Company's business plan.

In December 2014, the NiSource board of directors approved having Skaggs and Smith join the Company, with Skaggs as CEO and chairman of the board and Smith as

CFO. Skaggs and Smith made the move in part because they did not "want to work forever" and they saw an opportunity for a "sale in the near term." Compl. ¶ 33. They entered into change-in-control agreements with the Company that tracked their arrangements with NiSource. Smith received greater benefits from the Company than he had with NiSource, with the multiplier on his payout increasing from two times to three times his target annual bonus.

Skaggs and Smith anticipated that the Company would become an acquisition target. As part of their pre-transaction planning, management engaged Lazard Frères & Co. as the Company's financial advisor. In May 2015, Lazard gave a presentation to Company management about strategic alternatives. The presentation identified possible acquirers, including Dominion Energy Inc., Berkshire Hathaway Energy, Spectra Energy Corp., and NextEra Energy Inc.

On May 28, 2015, Lazard contacted TransCanada and mentioned that the Company might be for sale shortly after the spinoff. A contemporaneous memorandum from Skaggs' personal financial advisor stated that the Company "could be purchased as early as Q3/Q4 of 2015." *Id.* ¶ 39. He wrote, "I think they are already working on getting themselves sold before they even split. This was the intention all along. [Skaggs] sees himself only staying on through July of 2016." *Id.* (alteration in original) (emphasis omitted).

In June 2015, Lazard advised TransCanada against "opening a dialogue" with the Company until after the spinoff. *Id.* ¶ 37. Lazard warned that doing so could jeopardize the tax-free status of the spinoff, which required that NiSource not have anticipated a sale.

7

**D.      Early Interest From Possible Buyers**

On July 1, 2015, NiSource completed the spinoff. That same month, the market for oil and gas began a sharp, cyclical downturn. The drop in commodity prices exerted downward pressure on the stock prices of midstream companies like CPPL.

On July 6, 2015, the CEO of Spectra contacted Skaggs to express interest in a deal. Although Skaggs viewed Spectra as a credible bidder, he did not meet with Spectra's CEO, and the Company did not offer to execute a non-disclosure agreement (an "NDA") with Spectra or provide Spectra with any diligence. Skaggs believed that Spectra would use its stock as an acquisition currency, and Skaggs wanted cash for his shares. He therefore rebuffed Spectra.

On July 20, 2015, Dominion expressed interest in buying the Company for $32.50 to $35.50 per share in cash. Lazard's contemporaneous discounted cash flow ("DCF") analysis valued the Company at $30.75 per share. Skaggs brought the proposal to the Board, but the Board turned down Dominion's offer because it failed to capture the value of the "significant growth projects that [the Company] would be embarking on over the next several years." Compl. ¶ 50. Skaggs asked Dominion to raise its price to the "upper-$30s." *Id.*

On August 12, 2015, the Company and Dominion executed an NDA. The NDA contained a standstill provision that prohibited Dominion from making an offer to purchase the Company without a written invitation from the Board. The standstill provision contained a feature colloquially known as a "don't ask, don't waive" provision (a

8

"DADW"), which prohibited the counterparty from asking the Company to amend or waive the standstill.

Meanwhile, TransCanada continued to examine the Company as an acquisition target. TransCanada's Vice President of Corporate Development, François Poirier, was friends with Smith. In early October, Poirier called Smith to express interest in a potential transaction.

## E. The Dual-Track Strategy

During fall 2015, the energy markets continued to deteriorate. CPPL's stock price declined, undercutting its ability to serve as a vehicle for raising capital.

During a meeting of the Board in mid-October 2015, Skaggs recommended a dual-track strategy. Along the first track, the Company would prepare for an equity offering. Along the second track, the Company would engage in talks with potential acquirers and financing partners. Columbia would move forward with an equity offering unless a potential buyer offered to pay at least $28 per share. The Board endorsed Skaggs' plan.

As part of the dual-track strategy, Skaggs engaged in further talks with Dominion. On October 26, 2015, Skaggs told Dominion's CEO that the Company soon would be pursuing an equity offering and that Dominion would need to move quickly if it wanted to acquire the Company. Dominion proposed a complex structure in which Dominion and NextEra jointly would acquire the Company for a combination of cash and stock. The next day, Skaggs met with his personal financial advisor to discuss his possible retirement in July 2016, if not sooner. Compl. ¶ 57.

In early November 2015, the Company entered into NDAs with Dominion, NextEra, and Berkshire. Each contained a standstill and a DADW provision. The length of the standstills varied, with most lasting eighteen months.

The potential buyers began conducting due diligence, but Skaggs and Smith did not believe that the Company could delay an equity offering much longer. They understood that if an acquirer perceived that the Company was running out of cash and could not continue to pursue its business plan, then the acquirer would try to take advantage of that situation. The Company either needed to enter into a transaction before it became cash constrained, or it needed to raise capital to solidify its balance sheet.

On November 19, 2015, Skaggs and Smith invited TransCanada and Berkshire to make a bid by November 24. They explained that if no one bid by that date, then the Company would move forward with the equity offering. Skaggs and Smith did not inform NextEra, Dominion, or Spectra about the bid deadline. A bid from the latter group of companies likely would have included a stock component, and Skaggs and Smith preferred a cash deal.

On November 24, 2015, TransCanada expressed interest in an acquisition at $25 to $26 per share. Berkshire expressed interest in an acquisition at $23.50 per share. Skaggs informed the Board that the Company's management had received "no additional word" from Dominion, NextEra, or Spectra. *Id.* ¶ 63. That technically was true, but Skaggs and Smith failed to tell the Board that Dominion, NextEra, or Spectra did not know about the deadline of November 24. The way Skaggs framed his report made it seem like those potential acquirers were not interested in a deal, which was not true.

10

On November 25, 2015, the Board decided that the indications of interest from Berkshire and TransCanada were too low to pursue. The Board elected to terminate merger talks and proceed with the equity offering. The Company sent letters to Dominion, NextEra, Berkshire, and TransCanada instructing them to stop work on any potential transaction and destroy the confidential information they had received. Dominion and NextEra responded, "This was news to us—we were working on it." *Id.* ¶ 67. Demonstrating Dominion's seriousness about making an acquisition, its CEO immediately contacted a competitor of the Company, which Dominion purchased for $4.4 billion. By failing to tell Dominion about the bid deadline of November 24, Skaggs and Smith foreclosed any prospect of a merger with Dominion.

On the same day that the Company instructed the bidders to stop work, Smith told Poirier that the Company "probably" would want to pick up merger talks again "in a few months." *Id.* ¶ 75. The Board did not authorize Smith to convey that message to TransCanada, and Smith did not provide any other bidders with that information. Up until this point, Skaggs and Smith had shown only slight, if any, favoritism towards TransCanada. After this point, Skaggs and Smith increasingly would favor TransCanada.

## F. The Equity Offering

After the market closed on December 1, 2015, the Company announced an equity offering at $17.50 per share. The offering was oversubscribed and raised net proceeds of $1.4 billion. The underwriters exercised their option to purchase an additional 10.725 million shares. The high demand suggested that market participants regarded the Company's stock as undervalued.

11

Also on December 1, 2015, Wells Fargo published an analyst report that warned about "near term . . . counterparty risk" for midstream energy companies. Compl. ¶ 42. Many fossil fuel producers had fixed, take-or-pay contracts with midstream operators, so a major decline in commodity prices created a risk that producers might not meet their obligations to midstream operators like the Company. Shortly thereafter, Skaggs reported to the Board that he had attended an energy conference marked by a "defensive (if not dark) tone . . . given the negative outlook for commodity prices and the financial markets' severe dislocation." *Id.* ¶ 43. Skaggs said that conference participants asked him repeatedly about the Company's counterparty risk. Later in December 2015, a major midstream company cut its dividend by 75% and reduced its capital expenditures due to the decline in commodity prices, reinforcing the pessimism that pervaded the market.

That same month, the Protecting Americans from Tax Hikes Act (the "PATH Act") became effective. The PATH Act reduced the Company's effective tax rate, which in turn increased the Company's after-tax profits. The Company estimated that between 2018 and 2023, it would have approximately $1 billion more cash on hand than without the PATH Act. *Id.* ¶ 73.

In mid-December 2015, Poirier called Smith to reiterate TransCanada's interest in a deal with the Company. TransCanada was bound by a standstill with a DADW provision, and Poirier's call violated the standstill.

Rather than treating Poirier's call as a violation of the standstill, Smith scheduled a meeting with Poirier for January 7, 2016. Smith told Skaggs about Poirier's outreach, and

they shared the information with Goldman Sachs & Co., one of the Company's financial advisors. No one told the Board.

In mid-December and early January, Skaggs began meeting with individual Board members to prime them to support a sale of the Company. Skaggs told each director that the Company's business plan involved a "significant amount of execution risk (both financial and operational)." *Id.* ¶ 77. Skaggs emphasized the "[n]eed to continue to consider strategic alternatives." *Id.* He also noted that the Company's CEO succession plan called for him to resign in just eight months on July 1, 2016. Without a sale, the Board would need to find a new CEO.

## G.     The January 7 Meeting

On January 5, 2016, Smith emailed Poirier 190 pages of confidential information about the Company. The package included updated financial projections and Columbia's counterparty agreements with its customers. Smith did not obtain Board approval before sending this information to Poirier. The Company did not send similar information to any of the other potential bidders who had terminated discussions in November 2015.

On January 7, 2016, Smith met with Poirier (the "January 7 Meeting"). In advance of the meeting, Goldman had prepared a set of talking points for Smith to use with Poirier, which Skaggs had approved. One of the talking points explained how TransCanada could convince the Board to agree to a deal with TransCanada without putting the Company "in play," thereby avoiding a competitive auction. Compl. ¶ 87.

Smith literally handed Poirier the list of talking points. He then stressed that TransCanada was unlikely to face competition from major strategic players, telling Poirier

13

in substance that the Company had "eliminated the competition." *Id.* ¶ 84. By doing so, Smith contravened Goldman's advice to the effect that "[c]ompetition (real or perceived) is the best way to drive bidders to their point of indifference." *Id.* ¶ 86.

The Board did not authorize Smith to meet with TransCanada, much less to give TransCanada advice on how to avoid competing in an auction for the Company. It is reasonable to infer that Smith's assurance about TransCanada not facing competition undermined the Company's bargaining leverage with TransCanada.

## H.     TransCanada Obtains Exclusivity.

On January 25, 2016, TransCanada expressed interest in a transaction in the range of $25 to $28 per share, comparable to what TransCanada had proposed in November 2015. The Board had not waived the DADW standstill, nor had the Board invited TransCanada to make an offer. The offer breached the standstill.

During a two-day meeting on January 28 and 29, 2016, the Board considered TransCanada's offer. Skaggs attempted to persuade the Board to enter into a deal with TransCanada. As part of his efforts, Skaggs gave a presentation that overstated the near-term risks to the Company and its business plan. He told the directors that to reject a price of $26 per share, they would need to believe that the Company's stock price would reach $30.11 per share in the next year. In reality, the underlying analysis prepared by Goldman indicated that the Board only would need to believe that the Company's stock price would reach $30.11 per share *in the next twenty-three months*. Compl. ¶ 92. Because the Company was expanding rapidly, the difference was significant. Skaggs also did not inform the directors that Goldman's analysis indicated that to reject a price of $26 per share, they only

14

had to believe that the Company's stock price would reach $27.95 per share by the end of 2016. The Company's stock price had traded above $27 per share only five months earlier. *Id.* ¶ 93.

The Board ignored TransCanada's breach of the DADW standstill provision and directed management to grant TransCanada exclusivity through March 2, 2016. The Company later extended the exclusivity period through March 8, 2016. During the exclusivity period, the Company could not accept or facilitate an acquisition proposal from anyone but TransCanada, except in response to a "bona fide written unsolicited Transaction Proposal" that did not result from a breach of the exclusivity agreement. During the exclusivity period, sixty-nine TransCanada employees conducted diligence on the Company. *Id.* ¶ 96.

On February 11, 2016, Skaggs met with his personal financial advisor and reiterated that he planned to retire on July 1, 2016. *Id.* ¶ 97.

## I.     The Board Demands A Price.

On March 4, 2016, the Board directed management to demand a formal merger proposal from TransCanada. The Board also instructed Skaggs and Smith to waive the standstill provisions in the NDAs between the Company and the other potential bidders.

Skaggs and Smith ignored the Board's direction and did not inform the other bidders that the Board was waiving their standstills. They did not carry out that instruction until over a week later, on March 12, 2016, after the Board reiterated its directive. It is reasonable to infer that Skaggs and Smith failed to carry out the Board's instructions because they favored a deal with TransCanada.

15

On March 8, 2016, the Company learned that the *Wall Street Journal* was preparing a story about TransCanada being in talks to acquire the Company. The exclusivity period expired that night, so the Company could have used the expiration of the exclusivity period and the publicity from the story to engage with other bidders.

On March 9, 2016, TransCanada offered to acquire the Company for $26 per share. Under TransCanada's proposal, 90% of the consideration would be in cash and 10% would in TransCanada stock.

On March 10, 2016, The *Wall Street Journal* broke the story. That same day, the Board convened to discuss TransCanada's proposal. Skaggs reminded the Board that the exclusivity period had expired and that the news story could lead to additional inbound offers. The Board previously had instructed Skaggs and Smith to waive the DADW standstill provisions in the NDAs with Dominion, NextEra, and Berkshire, but Skaggs and Smith had disregarded that directive.

**J.      Spectra Tries To Engage.**

On March 11, 2016, Spectra emailed Skaggs to start merger talks. Spectra's CEO asked Skaggs to let him know "as soon as possible when we may speak or get our teams together to determine how best to realize the potential opportunities for our shareholders." Compl. ¶ 103 (alteration omitted).

Skaggs downplayed the seriousness of Spectra's offer to the Board. He prepared a script "to use with Spectra and other inbounds," which the Board approved. *Id.* ¶ 105. The script stated, "We will not comment on market speculation or rumors. With respect to

16

indications of interest in pursuing a transaction, we will not respond to anything other than serious written proposals." *Id.*

Skaggs informed TransCanada that the Company had received "an inbound from a credible, large, midstream player." *Id.* ¶ 106. Skaggs then asked TransCanada to approve the script, saying:

> Our board has agreed to the renewal of the EA for one week subject to your agreement that this scripted response would not violate the terms of the EA (both in terms of the inbound received in the EA's gap period and going forward until signing, which unfortunately, given the leak, there is a potential that we will receive additional inquiries). Please confirm via response to this email that TransCanada is in agreement with this condition/interpretation and we will send over the new EA.

*Id.* (alterations omitted). Skaggs offered to renew TransCanada's exclusivity agreement through March 18, 2016. *Id.* ¶ 104.

When Skaggs made this proposal, TransCanada and the Company no longer had an exclusivity agreement, and Skaggs knew that. He nevertheless treated TransCanada as if the exclusivity agreement remained in place. After receiving Skaggs' message, TransCanada demanded a "moral commitment" that the phrase "serious written proposal" meant a "financed bid subject only to confirmatory" diligence. *Id.* ¶ 108. Skaggs agreed. *Id.* ¶ 109. Smith understood this concept to require

> [a] bona fide proposal that says I will pay you X for your company. Hard and fast. No outs. No anything. No way to wiggle out of anything. This is going to happen. You're going to pay whatever you're going to pay per share and we're going to sign that agreement and we're done.

*Id.*

17

The moral commitment to insist on a fully financed bid subject only to confirmatory diligence established a condition that no competing bidder could meet. After August 2015, when the energy markets began their cyclical downturn, the Company had not received a serious written proposal from any potential bidder—much less a fully financed bid— unless the bidder first conducted diligence. TransCanada had conducted diligence for over a month before making its offer of $26 per share. Skaggs and Smith both understood that it was highly unlikely that a potential bidder could meet this standard. *Id.* ¶ 111.

Also on March 11, 2016, the Board repeated its direction that management waive the standstills with Berkshire, Dominion, and NextEra. Skaggs and Smith delayed sending the emails until the following day. *Id.* ¶ 112.

Skaggs and Smith next instructed Goldman to screen Spectra's calls so that Spectra could not talk with management directly. On March 12, 2016, Spectra's CFO and head of M & A called Goldman, and Goldman read the script. Spectra's CFO responded that Spectra could "move quickly" and "be more specific subject to diligence." *Id.* ¶ 114. But the script did not contemplate that option, prompting one Goldman banker to ask, "Does [Spectra] 'get it' that they aren't going to get diligence without a written proposal?" *Id.* (alteration in original). The inverted approach—requiring a fully financed proposal before due diligence—effectively shut out Spectra.

Goldman informed Skaggs and Smith that the involvement of Spectra's CFO meant that Spectra was "get[ting] serious." *Id.* ¶ 113. Later on March 12, Spectra's CFO made a follow-up call and told Goldman to expect a written offer in the "next few days" absent a "major bust." *Id.* ¶ 115. The banker who took the call found Spectra's assurance credible,

18

but Skaggs and Smith were not going to engage with Spectra without a serious written proposal that met their restrictive definition. Spectra never made a written offer, and TransCanada never faced competition from Spectra.

Meanwhile, the Company's business was rebounding. The Company had outperformed its internal projections, and CPPL was trading at levels sufficient for the Company to use its equity to raise capital.

## K.     TransCanada Lowers Its Offer.

On March 14, 2016, TransCanada lowered its offer from $26 to $25.50. It is reasonable to infer that the solicitude that Skaggs and Smith showed towards TransCanada contributed to TransCanada's conclusion that it could lower its bid.

By going backward on price, TransCanada caused the renewed exclusivity agreement to terminate and freed the Company to engage with other bidders. But TransCanada placed a three-day deadline on its offer and threatened that if the Company did not accept the offer within that timeframe, then TransCanada would announce the termination of negotiations. A public announcement of that sort could suggest that TransCanada had uncovered problems with the Company, turning Columbia into damaged goods and hurting the Board's ability to secure an alternative transaction.

On March 16, 2016, the Board met to consider TransCanada's offer. At the conclusion of the meeting, the Board approved the Merger Agreement. The parties executed the Merger Agreement the following day.

19

**L.     The Merger Agreement**

The Merger Agreement contained a no-shop provision that prohibited the Company from contacting, engaging with, or providing confidential diligence materials to a competing bidder except in response to a "Superior Proposal." MA § 4.02. Before sharing confidential diligence materials in response to a Superior Proposal, the Board had to determine that failing to engage with the bidder would breach its fiduciary duties. In the event of termination, the Merger Agreement required the Company to pay TransCanada a termination fee of $309 million plus an expense reimbursement of up to $40 million. The termination fee amounted to three percent of the Merger's equity value, or seventy-seven cents per share. The expense reimbursement added another ten cents per share.

The Merger Agreement provided TransCanada with matching rights. If the Company received a Superior Proposal *and* the Board determined that its fiduciary duties required it, then the Board could change its recommendation that stockholders vote their shares in favor of the Merger or, if the Board wished, terminate the Merger Agreement to enter into a definitive agreement with respect to a Superior Proposal. *See id.* §§ 4.02(c)–(d). The Company had to give TransCanada four business days' prior notice, and during that period TransCanada could match the competing offer. *Id.* § 4.02(d)(i). TransCanada's matching right was unlimited, and any new or revised Superior Proposal triggered an additional matching period of four business days. *Id.* § 4.02(d)(i).

Because TransCanada could match any competing bidder, an overbid could succeed only by driving the bidding beyond TransCanada's reserve price. Otherwise, a bidder could cause TransCanada to pay more, but would not have a path to success. Anticipating this

outcome and reasoning backward, a competing bidder that did not believe it could outbid the Company would not engage. And because TransCanada had conducted extensive due diligence, any competing bidder faced the threat that it would suffer the "winner's curse" and could prevail only by overpaying.

**M.      The Merger Closes.**

Despite the cyclical downturn in energy markets, the Company's business outperformed management's internal forecasts. On May 10, 2016, Smith reported to the Board that the Company's performance was "strong" and that all of the Company's projects were proceeding as planned. Compl. ¶ 47.

On May 17, 2016, the Company issued a proxy statement (the "Proxy") describing the Merger and recommending that its stockholders approve it. Under the Merger Agreement, TransCanada had the right to participate in drafting the Proxy and review its contents before it was disseminated to the Company's stockholders. The Merger Agreement obligated TransCanada to provide to Columbia any information it possessed that was required to be disclosed in the Proxy. MA §§ 5.01(a)–(b).

The Company held a special meeting of stockholders on June 22, 2016. Holders of 310,249,225 shares, representing 77.5% of the Company's 400,406,668 shares outstanding, were present in person or by proxy. Holders of 95.3% of those shares voted in favor of the Merger. As a result, the Merger received support from holders of 73.9% of the outstanding shares. *See* Columbia Pipeline Group, Inc., Current Report (Form 8-K) (June 22, 2016).

21

The Merger closed on July 1, 2016. Shortly thereafter, Skaggs and Smith retired. Skaggs received retirement benefits of approximately $26.84 million, representing $17.9 million more than he would have received without a sale of the Company. Smith received $10.89 million, representing $7.5 million more than he would have received without a sale of the Company.

## N.     The Deal-Related Litigation

The Merger gave rise to a procession of litigation. It began with the Original Fiduciary Action, filed by different stockholder plaintiffs in this court. Other former stockholders perfected their appraisal rights and pursued the Appraisal Proceeding. As the Appraisal Proceeding was moving towards trial, the current stockholder plaintiffs brought this proceeding and sought to consolidate the two lawsuits for purposes of trial. TransCanada, which was the real party in interest in the Appraisal Proceeding, successfully opposed that effort, and this action lay dormant until after the issuance of the Appraisal Decision. Information uncovered in the Appraisal Proceeding also prompted a fourth set of stockholders to attempt to assert federal securities claims, resulting in the Federal Securities Action.

### 1.     The Original Fiduciary Action

Shortly after the Merger was announced, four individual stockholders filed putative class action lawsuits in this court. Stephen M. Vann and Dennis Zuke filed an action on March 30, 2016. C.A. No. 12152-VCL, Dkt. 1. Anthony Baldino filed an action on April 7, 2016. C.A. No. 12179-VCL, Dkt. 1. Gerald Freeman and Joseph Gogolak joined Vann

and Zuke and sought consolidation. The court granted the motion, resulting in the Original Fiduciary Action.

None of the parties to the Original Fiduciary Action moved to certify a class, and the putative class never was certified. Before filing suit, none of the plaintiffs used Section 220 of the Delaware General Corporation Law to obtain books and records, nor did they obtain any non-public information. The plaintiffs and their counsel simply read the Proxy and reviewed public information, then drafted complaints. They named as defendants Skaggs, Smith, and the other members of the Board.

The defendants moved to dismiss the consolidated complaint, and the court granted the motion. *In re Columbia Pipeline Gp., Inc. S'holder Litig.*, 2017 WL 898382 (Del. Ch. Mar. 7, 2017) (ORDER). In their central argument, the plaintiffs contended that Skaggs, Smith, and the directors "breached their duty of loyalty by engineering a spinoff and sale of the Company as part of a self-interested plan to cash in on lucrative change-in-control benefits." *Id.* at *2. In seeking dismissal, the defendants relied on the *Corwin* doctrine, which holds that when a majority of disinterested and fully informed stockholders have approved a transaction, then the business judgment rule applies. *See id.* at *1 (citing *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015)). Under *Corwin*,

> [E]ven if [the] plaintiffs had pled facts from which it was reasonably inferable that a majority of [the company's] directors were not independent, the business judgment standard of review still would apply to the merger because it was approved by a majority of the shares held by disinterested stockholders of [the company] in a vote that was fully informed.

*Id.* at *1 (alterations in original) (citation omitted). To defeat *Corwin* cleansing, a plaintiff must plead the existence of a disclosure violation. *See id.* at *2.

23

After reviewing the complaint, the court agreed that "[t]he allegations of the complaint in support of this theory are sufficiently detailed to state a pleadings-stage claim for breach of the duty of loyalty against the defendants." *Id.* But under *Corwin*, the question was whether those facts were disclosed sufficiently.

> [T]he plaintiffs contend[ed] that the Proxy failed to disclose that the defendants engineered the spinoff as part of a plan to generate change-in-control benefits. The plaintiffs also cite[d] disclosures that the defendants made about the long-term value of the Company, and they allege[d] that the directors also had an obligation to disclose that they had personal plans that conflicted with pursuing a long-term strategy.

*Id.* at *3.

The court held that the Proxy disclosed sufficient information such that the plaintiffs had not stated a claim on which relief could be granted. The plaintiffs conceded that "the basic terms of Defendants' compensation packages were publicly available," and the Proxy "disclosed that the total value of change-in-control benefits that Skaggs and Smith earned through the TransCanada merger was higher than the benefits those individuals would have received if NiSource had sold the Company without a spinoff." *Id.* The court also observed that

> [t]he Proxy disclosed that the Company took steps before the completion of the spinoff to prepare for potential acquisition offers. The Proxy disclosed that on September 17, 2014, the Company engaged Lazard, effective as of the completion of the spinoff, to provide financial advice. The Proxy also disclosed that the Company engaged Goldman pursuant to engagement letters dated March 19, 2015, and July 2, 2015. The Proxy disclosed that in July 2015, just after the completion of the spinoff, Party A and Party B approached the Company with expressions of interest. The Proxy described that on August 3 and 4, 2015, the Board engaged in a comprehensive review of the Company's strategic alternatives. The Proxy continued with a detailed description of the material steps in the process leading up to the Merger Agreement in March 2016.

*Id.* Notably, the plaintiffs did not "allege that the Proxy failed to disclose any material facts regarding the sequence of events between the announcement of the spinoff in September 2014 and the merger vote in June 2016." *Id.* The plaintiffs merely contended that "the defendants were obligated to disclose that they acted for selfish and self-interested reasons." *Id.*

The court explained that Delaware law only requires that fiduciaries disclose facts; it does not demand that fiduciaries "engage in self-flagellation." *Id.* The court observed that "the Company's stockholders had access to the same information as the plaintiffs" and just as easily could "stitch together the facts to draw the inference that former NiSource fiduciaries used the spinoff to benefit themselves." *Id.* The court held that "[t]he material facts were disclosed" and "[t]hat is all Delaware law requires." *Id.*

The plaintiffs also asserted that Goldman, the Company's financial advisor, faced a conflict of interest because one of its affiliates—an asset manager that managed third-party funds—owned shares of stock in TransCanada. The plaintiffs had located this information in a publicly available filing, which disclosed both that Goldman's ownership of TransCanada stock amounted to "about nine thousandths of a percent (0.009%) of [Goldman's] overall reported positions" and that Goldman owned a much larger position in the Company stock. *Id.* at *4. The court determined that it was not reasonably conceivable that Goldman's interests favored TransCanada, and that disclosure of Goldman's holdings was not required under extant precedent. *Id.*

Finally, the plaintiffs contended that the Proxy provided a partial and misleading account of Spectra's outreach, citing a story in the *Wall Street Journal* and a section of the

Proxy in which the Company's financial advisors described an analysis of a range of potential bids from a "Party A." *Id.* The court rejected this claim, noting that Delaware law does not require disclosure of preliminary discussions or the details of every analysis that a financial advisor conducted. *Id.* at *5.

Because the plaintiffs had failed to plead a viable disclosure claim, the business judgment rule applied, and the court dismissed the complaint. *Id.* The plaintiffs did not appeal, and the order became final.

None of the plaintiffs from the Original Fiduciary Action are parties to this case. Neither of the plaintiffs in this case were parties to the Original Fiduciary Action. No one argues that the rulings in the Original Fiduciary Action have any effect on this case.

## 2. The Appraisal Proceeding

In September 2017, two groups of hedge funds filed petitions seeking appraisal. *See* C.A. No. 12749-VCL, Dkt. 1; C.A. No. 12736-VCL, Dkt. 1. The petitioners collectively held 7,963,478 shares of Company stock, worth $203 million at the deal price. The two groups of appraisal petitioners jointly sought consolidation. The court granted the motion, resulting in the Appraisal Proceeding.

The parties engaged in discovery for more than a year, generating a vast record. The case proceeded to trial in October 2018. Over the course of five days, the parties submitted 1,472 exhibits, including twenty-one deposition transcripts. Nine fact witnesses and five experts testified live.

On August 12, 2019, this court issued the Appraisal Decision, which held that the fair value of the Company's stock at the time of the Merger was equal to the deal price of

26

$25.50 per share. *In re Appraisal of Columbia Pipeline Gp., Inc.*, 2019 WL 3778370, at *1 (Del. Ch. Aug. 12, 2019). In the course of reaching that conclusion, the court made a number of factual findings and subsidiary legal rulings that the parties to the current action seek to invoke or evade. Because this decision discusses those issues at length elsewhere, it passes over them here.

None of the appraisal petitioners are parties to this case. Neither of the plaintiffs in this case was a party to the Appraisal Proceeding.

### 3.     This Lawsuit

On July 3, 2018, while the Appraisal Proceeding was pending, plaintiff Public Employees Retirement System of Mississippi ("Mississippi PERS") filed a lawsuit in this court on behalf of a putative class of similarly situated stockholders. C.A. No. 2018-0484-JTL, Dkt. 1. In its original complaint, Mississippi PERS named as defendants Skaggs, Smith, and all of the former members of the Board, claiming that they breached their duty of loyalty by "consciously failing to advance the best interests of [the Company's] stockholders" and by "disseminating a Proxy Statement that they knew was false and misleading." Dkt. 1 ¶¶ 92–93. Mississippi PERS also named TransCanada as a defendant for aiding and abetting breaches of fiduciary duty by "colluding with Smith during the process leading to the Merger to gain an unlawful advantage over other bidders." *Id.* ¶ 97.

In contrast to the plaintiffs in the Original Fiduciary Action, who filed their lawsuits based solely on the Proxy and publicly available information, Mississippi PERS conducted a meaningful pre-suit investigation. Among other things, Mississippi PERS relied on evidence developed in the Appraisal Proceeding that had become public during the course

of that litigation. In July 2018, Mississippi PERS moved to modify the confidentiality order in the Appraisal Proceeding so that Mississippi PERS could gain access to the full, unredacted discovery record. C.A. No. 12736-VCL, Dkt. 314. The appraisal petitioners supported the motion and proposed to prosecute the Appraisal Proceeding and this action jointly. C.A. No. 12736-VCL, Dkt. 315.

As the post-Merger owner of the Company, TransCanada was the real party in interest in the Appraisal Proceeding. TransCanada opposed Mississippi PERS' motion and argued that the court should not even consider it until after the conclusion of the trial in the Appraisal Proceeding. C.A. No. 12736-VCL, Dkt. 319. In response, Mississippi PERS formally moved to consolidate its action with the Appraisal Proceeding. C.A. No. 12736-VCL, Dkt. 328. The appraisal petitioners supported consolidation, citing considerations of "economy and procedural fairness" and arguing that "much of the evidence" presented in an appraisal proceeding "will be the same evidence presented during the equitable case." C.A. No. 12736-VCL, Dkt. 335 at 2 (citation and internal quotation marks omitted). Acting through the Company, TransCanada opposed this motion as well, claiming that the appraisal petitioners were trying to delay the appraisal trial. C.A. No. 12736-VCL, Dkt. 336. The court denied the motion, noting that consolidation would have required a complete reset of the trial schedule in the Appraisal Proceeding. Dkt. 16.

After this ruling, the fiduciary litigation largely remained dormant until after the issuance of the Appraisal Decision.

### 4. The Federal Securities Action

Meanwhile, in April 2018, a former stockholder of the Company named Henrietta Ftikas filed a putative class action in the United States District Court for the Southern District of New York (the "District Court").[2] Her complaint asserted that the Proxy contained material misstatements and omissions in violation of Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, and she named as defendants the Company, Skaggs, Smith, and Glen L. Kettering, the Company's former President. *Ftikas*, C.A. No. 1:18-cv-03670-GBD, Dkt. 1 ¶ 1. She also asserted a claim for violation of Section 20(a) of the Securities Exchange Act against the individual defendants in their capacities as "control persons" of the Company. *Id.* On June 8, 2018, another former stockholder of the Company, The Arbitrage Fund, filed a similar lawsuit that added a claim for breach of the fiduciary duty of disclosure under Delaware law. *See Arbitrage Fund v. Columbia Pipeline Gp., Inc.*, C.A. No. 1:18-cv-07127-GBD, Dkt. 1 (S.D.N.Y. June 8, 2018). The two actions were consolidated, resulting in the Federal Securities Action.

---

[2] *Ftikas v. Columbia Pipeline Gp., Inc.*, C.A. No. 1:18-cv-03670-GBD, Dkt. 1 (S.D.N.Y. Apr. 25, 2018). Ftikas originally filed a lawsuit challenging the Merger in May 2016, before the Merger closed, in the United States District Court for the Southern District of Texas. *See* Class Action Compl., *Ftikas v. Columbia Pipeline Gp., Inc.*, C.A. No. 4:16-cv-01205 (S.D. Tex. May 2, 2016). She did not make any effort to pursue her lawsuit. Five months later, in September 2016, she dismissed the action without prejudice. *See* Notice of Dismissal, *Ftikas v. Columbia Pipeline Gp., Inc.*, C.A. No. 4:16-cv-01205 (S.D. Tex. Sept. 7, 2016) ("Plaintiff . . . hereby dismisses this action without prejudice against all Defendants."); Order, Notice of Dismissal, *Ftikas v. Columbia Pipeline Gp., Inc.*, C.A. No. 4:16-cv-01205 (S.D. Tex. Sept. 9, 2016) ("Pursuant to the Notice of Dismissal filed on September 7, 2016, the above-styled action shall be and is hereby dismissed without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).").

No one asked the District Court to certify a class, and the putative class never was certified. The plaintiffs subsequently filed an amended complaint that added the other directors of the Company as defendants. The amended complaint continued to assert the same claims under the federal securities laws as well as the claim for breach of the fiduciary duty of disclosure under Delaware law. *In re Columbia Pipeline Gp., Inc. Sec. Litig.*, C.A. No. 1:18-cv-03670-GBD, Dkt. 35 at 1–2 (S.D.N.Y. Nov. 5, 2018). Like Mississippi PERS, the federal plaintiffs relied in part on evidence developed in the Appraisal Proceeding that had become public during the course of those proceedings.

The defendants responded to the consolidated complaint by moving to dismiss. The District Court issued the Federal Securities Decision, which largely granted their motion. *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494 (S.D.N.Y. 2019). Like the Appraisal Decision, the Federal Securities Decision contains rulings that the parties to the current action seek to invoke or evade. Because this decision discusses those rulings at length elsewhere, it passes over them here.

The plaintiffs in the Federal Securities Action did not appeal, and the Federal Securities Decision became final. Neither of the stockholders in the Federal Securities Action are parties to this case. Neither of the plaintiffs in this case were parties to the Federal Securities Action.

### 5. This Litigation Resumes.

On February 24, 2020, Mississippi PERS filed the currently operative complaint. Mississippi PERS dropped its claims against the members of the Board other than Skaggs; it continued to assert claims against Skaggs, Smith, and TransCanada.

30

The Complaint contains five counts.

- Count I asserts that Skaggs and Smith breached their duty of candor by causing the Company to issue a materially false and misleading Proxy in connection with the Merger.

- Count II asserts that Skaggs and Smith breached their fiduciary duties as officers by seeking to sell the Company so that they could retire with significant change-in-control benefits, tilting the sale process in favor of TransCanada, and failing to engage adequately with Spectra.

- Count III asserts that Skaggs breached his fiduciary duties as a director by pursuing his personal interest in retirement, tilting the sale process in favor of TransCanada, and failing to engage adequately with Spectra.

- Count IV asserts that TransCanada aided and abetted Skaggs' and Smith's breaches of fiduciary duty by making an indicative offer despite knowing it was bound by a DADW standstill, extracting a moral commitment from Skaggs and Smith that the Company only would entertain a formal, written offer, and then lowering its offer from $26 per share to $25.50 per share coupled with a three-day deadline and a threat to make a public announcement that negotiations had terminated. Count IV also asserts that TransCanada aided and abetted breaches of fiduciary duty by the Board.

- Count V asserts that TransCanada was unjustly enriched as a result of the Merger.

In March 2020, Skaggs, Smith, and TransCanada moved to dismiss the Complaint for failing to state a claim on which relief could be granted. Dkt. 33. Shortly thereafter, Mississippi PERS moved for partial summary judgment on Counts I and IV. Dkt. 35.

Meanwhile, plaintiff Police & Fire Retirement System of the City of Detroit filed its own lawsuit, asserting fundamentally the same claims as Mississippi PERS on behalf of the same putative class of stockholders. *See* C.A. No. 2020-0179-JTL, Dkt. 1. The court consolidated the two actions and designated both plaintiffs as co-lead plaintiffs. Dkt. 36.

This decision addresses the defendants' motion to dismiss the Complaint. The court will address the plaintiffs' motion for summary judgment separately.

31

## II. THE MOTION TO DISMISS STANDARD

The defendants have moved to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). The court need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party." *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'" *Cent. Mortg.*, 27 A.3d at 537. "The reasonable conceivability standard asks whether there is a possibility of recovery." *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *7 (Del. Ch. Dec. 20, 2019) (citing *Cent. Mortg.*, 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'")). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Cent. Mortg.*, 27 A.3d at 535.

# III. ISSUE PRECLUSION

A threshold issue is whether the plaintiffs are bound by and precluded from re-litigating either (i) the factual findings and legal rulings in the Appraisal Decision or (ii) the legal rulings in the Federal Securities Decision. The defendants' arguments in favor of dismissal largely consist of assertions that the Appraisal Decision or the Federal Securities Decision already decided each issue adversely to the plaintiffs.

The parties disagree on the legal principles that govern issue preclusion. The plaintiffs invoke traditional black-letter principles drawn from the *Restatement (Second) of Judgments* (the "*Restatement*") and applied persuasively in *Kohls v. Kenetech Corp.*, 791 A.2d 763 (Del. Ch. 2000), *aff'd*, 794 A.2d 1160 (Del. 2002) (ORDER). The defendants argue that a special preclusion rule applies when appraisal proceedings and breach of fiduciary duty actions arise out of the same transaction, relying on *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513 (Del. 1999). Alternatively, they argue that under contemporary Delaware doctrine, non-parties to a prior action are bound by the result as long as their interests were aligned with parties to the prior action and the prior parties adequately litigated the case, relying on *Aveta, Inc. v. Cavallieri*, 23 A.3d 157 (Del. Ch. 2010), and *Brevan Howard Credit Catalyst Master Fund Ltd. v. Spanish Broadcasting System, Inc.*, 2015 WL 2400712 (Del. Ch. May 19, 2015).

This decision concludes that the *Restatement* and *Kohls* articulate the operative principles of preclusion law. Under those principles, the plaintiffs are not bound by the rulings in the Appraisal Decision or the Federal Securities Decision.

33

## A.   The Law Governing Issue Preclusion

When analyzing issue preclusion, Delaware courts frequently rely on the *Restatement*.[3] That influential source describes the general rule of issue preclusion as follows: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."[4] The Delaware Supreme Court has framed the same rule in slightly different terms: "Under the doctrine of collateral estoppel, if a court has decided an issue of fact necessary

---

[3] *See, e.g.*, *Verrastro v. Bayhospitalists, LLC*, 208 A.3d 720, 728–29 (Del. 2019); *Cal. State Teachers' Ret. Sys. v. Alvarez*, 179 A.3d 824, 852–53 (Del. 2018); *Pyott v. La. Mun. Police Emps. Ret. Sys.*, 74 A.3d 612, 617–18 (Del. 2013); *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 193 (Del. 2009); *Messick v. Star Enters.*, 655 A.2d 1209, 1213 (Del. 1995); *Orloff v. Shulman*, 2005 WL 3272355, at *7 (Del. Ch. Nov. 23, 2005); *Carlton Invs. v. TLC Beatrice Hldgs., Inc.*, 1997 WL 208962, at *2 (Del. Ch. Apr. 21, 1997); *In re RJR Nabisco, Inc. S'holders Litig.*, 576 A.2d 654, 659, 662 & n.15 (Del. Ch. 1990).

[4] *Restatement*, *supra*, § 27; *accord id.* § 62 cmt. a ("It is a basic principle of law that a person who is not a party to an action is not bound by the judgment in that action."). When a party seeks to re-litigate the same claim and is precluded from doing so, the effect is described variously as claim preclusion, direct estoppel, or *res judicata*. *See id.* cmt. b; *see also Advanced Litig., LLC v. Herzka*, 2006 WL 2338044, at *8 (Del. Ch. Aug. 10, 2006) ("Delaware courts have used the terms res judicata and claim preclusion interchangeably."). "If, as more frequently happens, the second action is brought on a different claim," then the effect is described variously as issue preclusion or collateral estoppel. *Restatement*, *supra*, § 27 cmt. b; *see Alvarez*, 179 A.3d at 832 (using terms "interchangeably").

to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Messick*, 655 A.2d at 1211.[5]

As these formulations make clear, issue preclusion generally applies only "where the second action is between the same persons who were parties to the prior action." *Restatement*, *supra*, § 27 cmt. a. Conversely, a judgment does not bind a person who was not a party to the prior action. *Id.* § 34(3).

> Ordinarily, a person not a party to an action is not precluded from subsequently asserting a claim relating to the subject matter of the action. Generally speaking, the rules of procedure do not require that all persons interested in a transaction be made parties to an action arising from it. The premise is that claimants ordinarily should be free to assert their claims by separate action if they wish.

*Id.* § 62 cmt. a.

The general rule that non-parties are not bound by a prior adjudication is subject to three broad exceptions. First, a non-party is bound if validly and authoritatively represented in the prior action. Second, a non-party is bound if a party and the non-party have a pre-existing legal relationship, outside of the prior litigation, that is sufficient to cause the adjudication to bind the non-party. Third, a non-party can be bound if the non-party takes action with regard to the prior litigation that warrants binding them to the result. *See id.* The *Restatement* contains detailed sections governing each of these exceptions.

---

[5] The *Messick* decision concerned an "issue of fact." *Id.* The Delaware Supreme Court elsewhere has explained that preclusion extends to legal rulings. *See Hercules Inc. v. AIU Ins. Co.*, 783 A.2d 1275, 1278 (Del. 2000).

## 1. Represented Parties

Under the first exception, "a person who is represented by a party is bound by the judgment in an action involving the representative party." *Id.* Section 41 of the *Restatement* identifies the following representatives as having the power to bind a non-party validly and authoritatively to a judgment:

(a)     The trustee of an estate or interest of which the person is a beneficiary; or

(b)     [A party] [i]nvested by the person with authority to represent him in an action; or

(c)     The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary; or

(d)     An official or agency invested by law with authority to represent the person's interests; or

(e)     The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member.

*Id.* § 41.

When a valid form of representation otherwise would exist, Section 42 of the *Restatement* identifies five exceptions that operate to defeat preclusion. Under these exceptions, the non-party is not bound by the judgment if:

(a)     Notice concerning the representation was required to be given to the represented person, or others who might act to protect his interest, and there was no substantial compliance with the requirement; or

(b)     The subject matter of the action was not within the interests of the represented person that the party is responsible for protecting; or

(c)     Before rendition of the judgment the party was divested of representative authority with respect to the matters as to which the judgment is subsequently invoked; or

(d)     With respect to the representative of a class, there was such a substantial divergence of interest between him and the members of the class, or a group within the class, that he could not fairly represent them with respect to the matters as to which the judgment is subsequently invoked; or

(e)     The representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making that failure apparent.

*Id.* § 42. For purposes of this case, the last two exceptions are pertinent. They recognize that if a judgment against a representative otherwise could bind a non-party, preclusion nevertheless will *not* operate if the representative had interests that diverged substantially from the non-party's or if the representative did not adequately represent the non-party's interests in the prior suit.

Importantly, the presence of aligned interests and the existence of adequate representation does not *create* the possibility of preclusion. Rather, the absence of either prerequisite can *defeat* preclusion where it otherwise might apply. As discussed in greater detail below, I authored an overly broad sentence in *Aveta* that could be read as inverting this relationship. *See Aveta*, 23 A.3d at 180 (stating that "[p]arties are in privity . . . when their interests are identical or closely aligned such that they were actively and adequately represented in the first suit"). The *Brevan* decision subsequently quoted this sentence, and the defendants rely on those propositions here. But the relationship actually flows in the opposite direction. Initially, a representation must exist that provides a valid basis for preclusion. If so, then the represented party can *avoid* preclusion by showing a

37

misalignment of interests or inadequate representation. *See Restatement*, *supra*, § 42, Reporter's Note cmt. e.; *id.* § 42 cmts. e & f.

Consequently, under the *Restatement*, the fact that a party litigated a similar claim that resulted in a judgment does not result in the judgment binding a similarly situated non-party. For the prior judgment to have binding effect, the party to the prior case must serve in a representative capacity. To represent a class of similarly situated parties, the representative party must be appointed formally as a class representative. *Id.* § 41 cmt. e. This latter requirement has constitutional dimensions, and the Supreme Court of the United States has explained that to apply issue preclusion against members of a putative but uncertified class violates the Due Process Clause in the Fourteenth Amendment to the United States Constitution. *See Smith v. Bayer Corp.*, 564 U.S. 299 (2011).

The *Bayer* litigation began in 2001, when a plaintiff named George McCollins sued Bayer Corporation in West Virginia state court. His complaint asserted various state-law claims relating to Baycol, a drug sold by Bayer. McCollins sought to represent a class comprising all West Virginia residents who had purchased Baycol. A month later, another West Virginia resident, Keith Smith, filed a similar action in a different county court. Neither knew about the other's suit. Bayer removed the McCollins case to federal court based on diversity jurisdiction, but the Smith case remained in state court for lack of complete diversity. Six years later, with both cases moving at roughly the same pace, the federal court denied class certification in the McCollins action. Bayer then moved to have the federal court enjoin the state court from certifying a class in the Smith action, arguing that "the proposed class in Smith's case was identical to the one the federal court had just

rejected." *Id.* at 304. The federal court issued the injunction, and the United States Court of Appeals for the Eighth Circuit affirmed.

The Supreme Court of the United States reversed based on an interpretation of the Anti-Injunction Act. *Id.* at 307. The Court nevertheless went on to explain that under settled principles of issue preclusion, "[n]either a proposed class action nor a rejected class action may bind nonparties." *Id.* at 315. In the course of its discussion, the Court disagreed with Bayer's argument that "Smith—an unnamed member of a proposed but uncertified class— qualifies as a party to the McCollins litigation." *Id.* at 313. The Court explained that this argument "ill-comports with any proper understanding of what a 'party' is," and that while an unnamed member of a *certified* class can be considered a party for limited purposes, no one would "advance the novel and surely erroneous argument that a nonnamed class member is a party to the class-action litigation *before that class is certified.*" *Id.* (internal quotation marks omitted). The Court emphasized that a decision properly authorizing the plaintiff to represent a class would be a precondition for binding unnamed class members. *Id.* at 315. *See generally Taylor v. Sturgell*, 553 U.S. 880, 898–901 (2008) (rejecting on similar grounds the theory of preclusion by "virtual representation").

Although the discussion in *Bayer* was technically *dictum*, subsequent decisions have relied on it.[6] Citing *Bayer*, the Supreme Court of the United States since has reiterated that

---

[6] *See, e.g., Bartel v. Tokyo Elec. Power Co.*, 371 F. Supp. 3d 769, 782 (S.D. Cal. 2019) (citing *Bayer* and holding issue preclusion did not apply because the putative class in the prior action "was never certified" and "there were no special procedures . . . to ensure any nonparty's interests were protected," which meant that allowing preclusion would violate the plaintiffs' due process rights); *Rivera v. P.R. Elec. Power Auth.*, 4 F. Supp. 3d

"a plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified" *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013).

## 2. Parties In Privity

A second exception to the general rule that a judgment will not bind non-parties arises when the party and a non-party have a "pre-existing legal relationship[]," formed independent of the prior litigation and distinct from one of the representative relationships, that would warrant binding the non-party. *Restatement*, *supra*, § 62 cmt. a. Examples

342, 352–53 (D.P.R. 2014) (noting that preclusion "raises important constitutional rights and due-process concerns" and rejecting the defendant's attempt "to distinguish the holding in *Smith* by highlighting . . . that said case involved the application of the Anti-Injunction Act" because "*Smith* stands for the proposition that all proposed class actions, regardless of the underlying substantive issue, may not bind nonparties absent certification"); *Browning v. Data Access Sys.*, Inc. 2012 WL 2054722, at *10 & n.11 (E.D. Pa. June 6, 2012) (holding that plaintiffs were not in privity with plaintiffs in prior action and holding "[i]n the alternative . . . that notions of due process would necessitate the same result"); *cf. Hilton v. Apple Inc.*, 2013 WL 5487317, at *8–9 (N.D. Cal. Oct. 1, 2013) (ruling on a motion to stay proceedings in favor of first-filed action, distinguishing *Bayer* by denying that the "[d]ue process concerns" that would be raised "if a party could be bound to a court's judgment without having had an opportunity (either directly or through a properly certified class representative) to be heard"); *see also Woodards v. Chipotle Mexican Grill, Inc.*, 2015 WL 3447438, at *3–4 (D. Minn. May 28, 2015) (holding plaintiff who consented to join a putative class action but who was not included in the group of plaintiffs who were certified conditionally as a class was not precluded from later bringing his own collective action based on the same allegations); *Philibotte v. Nisource Corp. Servs. Co.*, 2014 WL 6968441, at *2 n.2 (D. Mass Dec. 9, 2014) ("[I]ssue preclusion does not apply here because [the plaintiff] is not in privity with the plaintiff in [a prior action] since that action was never certified as a class action." (citing *Bayer*, 564 U.S. at 316 n.11)); *cf. Bridgeford v. Pac. Health Corp.*, 202 Cal. App. 4th 1034, 1044 (Cal. App. 2012) ("We find the reasoning in [*Bayer*] persuasive and conclude, under California law, that the denial of class certification cannot establish collateral estoppel against unnamed, putative class members . . . .").

include bailor and bailee, predecessor and successor owners of property, or indemnitor and indemnitee. *Id.* As the *Restatement* explains, these legal relationships "are the subject of specific rules" that define when preclusion applies. *See id.* (citing pertinent sections of the *Restatement*). Notably, in each case, the rights of one party derive to some extent or depend upon the rights of the other. The relationships do not merely involve similarly situated parties.

As the *Restatement* recognizes, "[t]hese relationships are often referred to as involving 'privity.'" *Id.* The *Restatement* cautions, however, against using the concept of "privity" outside of these pre-existing legal relationships:

> The difficulty with such an analysis is twofold. First, the term "privity," unless it refers to some definite legal relationship such as bailment or assignment is so amorphous that it often operates as a conclusion rather than an explanation. Second, the circumstance that persons have a close legal relationship with each other (such as husband and wife or owners of concurrent interests in property), or that one person helps another in litigation, by itself does not justify imposing preclusion on one of them on the basis of a judgment affecting the other.

*Id.* cmt. c (citations omitted). The fact that a close legal relationship like husband and wife or the parallel interests of concurrent owners of property is not sufficient, standing alone, to support privity emphasizes the narrow nature of this exception.

Delaware decisions have acknowledged that privity is a vague and unhelpful term. *See, e.g.*, *Aveta*, 23 A.3d at 180; *Kohls*, 791 A.2d at 769. Nevertheless, our decisions have tended to use privity as a catch-all concept that describes any relationship that is sufficient to impose preclusion, regardless of whether that relationship is based on a valid and authorized form of representation, a pre-existing legal relationship outside of the prior

41

litigation, or other action relating to the prior litigation that warrants binding the non-party. *See, e.g.*, *Foltz v. Pullman, Inc.*, 319 A.2d 38, 41 (Del. Super. 1974) ("The concept of privity pertains to the relationship between a party to a suit and a person who was not a party but whose interest in the action was such that he will be bound by the final judgment as if he were a party."), *overruled on other grounds by Messick*, 655 A.2d at 1213. In my view, it would be helpful to curtail this practice and deploy the *Restatement*'s more structured approach.

### 3. Action Regarding A Particular Case

The third exception to the general rule that a judgment will not bind non-parties recognizes that

> a person who is not a party to an action may be precluded by the judgment in an action when he is involved with it in a way that falls short of becoming a party but which justly should result in his being denied opportunity to relitigate the matters previously in issue.

*Restatement*, *supra*, § 62 cmt. a. This exception does not contemplate a broad or generalized inquiry into the equities of relitigating a particular issue; it rather involves analyzing whether the non-party engaged in specific types of conduct with respect to the prior litigation.

The most straightforward case for binding a non-party to a prior judgment arises when the non-party agrees to be bound by the result. *See id.* § 40. Such a person is "bound by the determination . . . in accordance with the terms of his agreement." *Id.* The agreement to be bound may be express or "implied from conduct and manifestations of intention,"

42

and it may concern "the determination of a claim, including all potential issues therein," or be limited to specific issues. *Id.* cmt. a.

A second common setting involves "[a] person who is not a party to an action but who controls or substantially participates in the control of the presentation on behalf of a party." *Id.* § 39. In this scenario, the nonparty "is bound by the determination of issues decided as though he were a party." *Id.* A specific application of this rule involves a corporation that "is closely held, in that one or a few persons hold substantially the entire ownership in it." *Id.* § 59(3). Under those circumstances, a judgment against the corporation "is conclusive upon the holder of its ownership if he actively participated in the action on behalf of the corporation, unless his interests and those of the corporation are so different that he should have opportunity to relitigate the issue." *Id.* In a comment, the *Restatement* explains that

> [w]hen the corporation is the party to the litigation, a controlling owner who participates in the conduct of the litigation ordinarily has full opportunity and adequate incentive to litigate issues commonly affecting him and the corporation. This identity of interest is perhaps most likely when the controlling owner is the parent of a subsidiary corporation, for in that case what is usually involved is a single enterprise organized in multiple legal forms. When the controlling owner is the party to the litigation, his opportunity and incentive to litigate issues commonly affecting him and the corporation is ordinarily sufficient to treat his participation as being on behalf of the corporation as well. In these circumstances, therefore, the rule of issue preclusion prima facie should apply.

*Id.* cmt. e.

A third setting involves a non-party who leads a party to believe that the non-party will treat the adjudication as binding and thereby induces the party to forego taking action

43

that might have bound the non-party to the judgment. The *Restatement* frames the test as

follows:

> A person not a party to an action who has a claim arising out of the transaction that was the subject of the action, and who knew about the action prior to the rendition of judgment therein, may not thereafter maintain an action on his claim against a party to the original action if:
>
> (1)    The enforcement of the claim against that party would result in subjecting him to inconsistent obligations or in a determination of his rights and duties that is incompatible with the judgment in the original action; and
>
> (2)    The claimant so conducted himself in relation to the original action that the party against whom the second action is brought:
>
>     (a)    Was reasonably induced to believe that the claimant would make no claim concerning the transaction or that the claimant would govern his conduct by the judgment in the original action; and
>
>     (b)    Justifiably abstained from employing procedures, such as joinder of the claimant or commencement of another action in which the claimant was made a party, that could have determined the claimant's claim.

*Id.* § 62.

The test for inducing reliance is difficult to meet: "Given the premise that a person

is ordinarily free to assert his claim by separate action, and given the opportunities for

joinder of third persons known to have claims arising out of the transaction through the

necessary party and other joinder rules . . . , denying a claimant opportunity to maintain his

action is warranted only in compelling circumstances." *Id.* cmt. a. The *Restatement*

cautions that "a person should not be denied that opportunity simply because the opposing

party may have to relitigate a matter already adjudicated with another." *Id.* It also is not

44

sufficient to warrant preclusion "that the claimant may have silently stood by while the prior action was pending, aware that he would not be bound unless made a party and aware also that he might benefit if the judgment was favorable to his position in the controversy." *Id.*

### 4.    The *Kohls* Decision

The most persuasive and analogous decision that illustrates the proper application of these principles is *Kohls*. The plaintiffs were holders of preferred stock who sought to (i) enforce a right to a special distribution and (ii) prove that the corporation's directors breached their fiduciary duties by failing to ensure that the preferred stockholders received their special distribution. A different preferred stockholder previously had pursued a similar action, and "the court [had] held a trial involving virtually the same facts and legal claims and ruled in the defendants' favor." *Kohls*, 791 A.2d at 765 (citing *Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*, 1999 WL 893575 (Del Ch. Oct. 13, 1998), *aff'd*, 751 A.2d 878 (Del. 2000) (ORDER)). In light of the prior action, the defendants moved to dismiss the *Kohls* action, claiming that collateral estoppel barred the *Kohls* plaintiffs from asserting their claims. *Id.* at 767.

Vice Chancellor Lamb rejected the application of collateral estoppel. He started with the basic proposition that the party invoking collateral estoppel as a defense "must show 'that the party against whom collateral estoppel is asserted was a previous party.'" *Id.* at 768 (quoting *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1217 (Del. 1991)). The *Kohls* plaintiffs "were concededly not parties to the *Quadrangle* action." *Id.*

45

He next turned to the three broad exceptions recognized in the *Restatement*. Focusing on the exception for representative proceedings, he noted that the *Quadrangle* action had not been certified as a class action. That exception therefore was inapplicable. *Id.* at 768 n.18. The defendants, however, argued that "if the interests of a party were adequately represented in a prior litigation," then preclusion would be appropriate. *Id.* at 768. Vice Chancellor Lamb rejected this argument as "largely irrelevant." *Id.* at 768–69. Returning to this issue later in the opinion, he explained that the *Quadrangle* plaintiff needed to be appointed as a class representative. Absent that act,

> it does not matter that Quadrangle *would have been* an adequate representative, had it been appointed to such role. A representative party must be granted such authority, either by the represented party itself (in accordance with agency principles) or, in the class action context, by the court. It is equally well-settled that a properly named class representative's failure to provide adequate notice to the purported class with respect to the action (or to adequately represent the interests of the class) will render any subsequent judgment non-binding upon the class. I thus find it self-evident that if a litigant never seeks to and is never compelled to act in a representative capacity, the class of people that theoretically could have been represented by that litigant is in no way precluded from asserting their own claims in a subsequent proceeding.

*Id.* at 769–70 (footnotes omitted).

Next, Vice Chancellor Lamb considered the exception for parties in privity, observing that it applied only where the non-party had "a *specific type of pre-existing legal relationship* with a named party, such as bailor and bailee, predecessor and successor or indemnitor and indemnitee." *Id.* at 769 (citing *Restatement*, *supra*, § 62 cmt. a). Echoing the *Restatement,* he cautioned that "[h]aphazard use of the term 'privity' can lead to improper findings of preclusion" and he noted that even a close relationship such as

husband and wife would not justify preclusion absent other factors. *Id.* He concluded that "[b]eing fellow stockholders is plainly not the type of legal relationship that fits the second exception listed above." *Id.*

This left only the third exception—whether the *Kohls* plaintiffs had engaged in some conduct in connection with the prior litigation that would warrant binding them to the judgment, such as inducing the defendants "reasonably to suppose that the litigation will firmly stabilize the latter's legal obligations." *Id.* (quoting *Restatement*, *supra*, § 60 cmt. c). This exception also did not apply:

> [T]he defendants do not claim that the Kohls knew about or actually did anything in connection with the prior litigation. Thus, defendants cannot assert that some affirmative conduct caused them to refrain from taking action bind the present plaintiffs, or, for that matter, the other PRIDES holders, to that action.

*Id.* He noted, for example, that the defendants could have moved to certify the *Quadrangle* action as a class action, but chose not to pursue that option. *Id.* at 768 n.18.

Vice Chancellor Lamb consequently held that collateral estoppel was unavailable. He nevertheless dismissed the plaintiffs' claims, demonstrating that an expansive application of preclusion principles is unnecessary and unwarranted. Vice Chancellor Lamb reasoned that under the doctrine of *stare decisis*, the *Kohls* plaintiffs could not state a claim on which relief can be granted "because the Kohls fail[ed] to distinguish their claims, either factually or legally" from the claims that the *Quadrangle* plaintiffs litigated and lost. *Id.* at 770. He concluded that "[n]ormal respect for the principle of *stare decisis* and application of the general standard for deciding a motion under Rule 12(b)(6)" required dismissal of the complaint. *Id.*

**5.     The Supposedly Special Rule Of *Le Beau***

In lieu of these established principles of black-letter law set out in the *Restatement* and applied in *Kohls*, the defendants asserted at oral argument that under *Le Beau*, a special preclusion rule governs when appraisal proceedings and breach of fiduciary duty actions arise out of the same transaction. Under the special regime that the defendants perceive, any factual finding or legal determination in one proceeding, regardless of which takes places first, has preclusive effect in the second proceeding, irrespective of whether the parties are the same. *See* Dkt. 57 at 7, 29–30. This reading misconstrues *Le Beau*, where preclusion applied under the black-letter rule that a judgment involving a party that controls an entity binds the entity itself.

The *Le Beau* litigation arose after a short-form merger between Southwest Bancorp, Inc. and its 91%-owned subsidiary, M.G. Bancorporation, Inc. In the merger, each minority share of M.G. Bancorporation stock was converted into the right to receive $41. *Le Beau*, 737 A.2d at 517. When determining the merger consideration, Southwest relied on a valuation report prepared by its financial advisor. *Id.* at 518.

Certain minority stockholders pursued an appraisal, naming both Southwest and M.G. Bancorporation as respondents.[7] Other stockholders opted not to pursue an appraisal;

---

[7] That is an odd fact. As the surviving corporation after the short-form merger, Southwest was the proper respondent in the appraisal proceeding. *See* 8 *Del. C.* § 262(f). As the constituent corporation that merged with and into Southwest, M.G. Bancorporation no longer existed after the short-form merger. Its separate corporate existence had ceased. *See* 8 *Del. C.* § 259 ("When any merger . . . shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations . . . except the one into which the other or others . . . have been merged . . .

48

they instead filed a putative class action against Southwest in its capacity as the controlling stockholder of M.G. Bancorporation. *See Nebel v. Southwest Bancorp, Inc.*, 1995 WL 405750, at *1 (Del. Ch. July 5, 1995). The plaintiffs in that lawsuit contended that Southwest breached its fiduciary duties as a controller by paying a price in the short-form merger that was not entirely fair and by failing to disclose all material information.

Southwest moved to dismiss the complaint in the breach of fiduciary duty lawsuit. One of the plaintiffs' disclosure claims alleged that the notice of merger improperly stated that Southwest had determined the "fair market value" of M.G. Bancorporation's stock rather than its "fair value." *Id.* at *4. To support this assertion, the plaintiffs cited the valuation report prepared by Southwest's financial advisor, which was attached to the notice of merger. The Court of Chancery held that these allegations failed to state a disclosure claim, because the disclosures accurately described what the financial advisor did. The advisor had valued "the 8.38% minority block of shares, *not* the entire corporation as a going concern." *Id.* The court held that "[m]anifestly that valuation methodology was legally improper, but the Notice plainly disclosed that that (incorrect) valuation approach had been employed." *Id.* (citation omitted).

---

shall cease . . . ."). Yet for reasons that are not evident, the appraisal claimants also named M.G. Bancorporation as a respondent. *See Le Beau*, 737 A.2d at 517. That outcome could make sense if Southwest caused M.G. Bancorporation to merge with an intervening subsidiary such that after the short-form merger, Southwest came to own 100% of M.G. Bancorporation. This decision assumes that is what happened.

Meanwhile, the appraisal proceeding proceeded through trial, which took place in 1996. Southwest did not call its financial advisor as a witness, choosing to rely on a different valuation expert. The Court of Chancery observed that the litigation expert's valuation opinion "serendipitously turned out to be only 90 cents per share more than [the financial advisor's] legally flawed $41 valuation," which the court viewed as rendering Southwest's position "highly suspect and meriting the most careful judicial scrutiny." *Le Beau v. M. G. Bancorporation, Inc.*, 1998 WL 44993, at *7 (Del. Ch. Jan. 29, 1998) (subsequent history omitted). Elaborating, the Court of Chancery stated:

> As a matter of plain common sense, it would appear evident that a *proper* fair value determination based upon a going concern valuation of the *entire* company, would significantly exceed a $41 per share fair market valuation of only a minority block of its shares. If Respondents choose to contend otherwise, it is their burden to persuade the Court that $41.90 per share represents [M.G. Bancorporation]'s fair value. The Court concludes that the Respondents have fallen far short of carrying their burden . . . .

*Id.* The Court of Chancery concluded that the fair value of M.G. Bancorporation was $85 per share. *Id.*

On appeal, Southwest argued that the Court of Chancery had misallocated the burden of proof. The Delaware Supreme Court rejected this assertion, holding that the trial court's ruling was "a proper application of the collateral estoppel doctrine." *Le Beau*, 737 A.2d at 520. The high court noted that "[c]ollateral estoppel prevents a party from relitigating a factual issue that was adjudicated previously." *Id.* The Delaware Supreme Court then observed:

> It is not unusual, as in this case, for the same merger to be challenged in a statutory appraisal action and in a separate breach of fiduciary duty damage action. Irrespective of whether the breach of fiduciary duty damage action or

50

the statutory appraisal action is decided first, the doctrine of collateral estoppel provides repose by preventing the relitigation of an issue of fact previously decided. The test for applying the collateral estoppel doctrine requires that (1) a question of fact essential to the judgment (2) be litigated and (3) determined (4) by a valid and final judgment.

*Id.* (footnotes omitted).

Applying these principles, the Delaware Supreme Court explained that "[i]n the context of this Merger, the breach of fiduciary duty damage action was adjudicated first." *Id.*[8] The high court then held that "[a]ccordingly, the Court of Chancery's prior holding in the breach of fiduciary duty damage action collaterally estopped the Respondents from relitigating the factual finding which rejected [the financial advisor's] opinion that the $41 per share was the fair value of [M.G. Bancorporation]'s stock as of June 30, 1993." *Id.* Later, the Delaware Supreme Court reiterated that

---

[8] As the Delaware Supreme Court later recognized, describing the breach of fiduciary duty action as having been "adjudicated first" was an overstatement. The Court of Chancery's ruling in the fiduciary duty action was not a final judgment, but rather the denial of a motion to dismiss. *See Nebel*, 1995 WL 405750, at *1 ("This is the opinion of the Court on the defendants' motion to dismiss"). The plenary fiduciary duty action remained pending, and just one month before the Delaware Supreme Court issued its ruling in the appraisal proceeding, the Court of Chancery denied a motion to dismiss an amended complaint filed by the stockholder plaintiffs. *See Nebel v. Southwest Bancorp, Inc.*, 1999 WL 135259 (Del. Ch. Mar. 9, 1999). After the Delaware Supreme Court issued its decision in *Le Beau*, Southwest sought reargument based on the interlocutory nature of the Court of Chancery's ruling. The Delaware Supreme Court denied the motion, stating that "the Court of Chancery's holding in the class action became the functional equivalent of a final judgment by virtue of a stipulated pretrial order," where the parties identified the financial advisor's use of a minority valuation as a fact that was "admitted and required no proof." *Le Beau*, 737 A.2d at 528. The Delaware Supreme Court reasoned that the stipulation made the finding "*final* because it was no longer in dispute," making the application of collateral estoppel appropriate. *Id.* In light of this clarification, it is perhaps best to regard *Le Beau* as a case involving the binding nature of a stipulation, rather than collateral estoppel.

the Respondents were collaterally estopped from arguing in the statutory appraisal action that [the financial advisor's] $41 determination represented [M.G. Bancorporation]'s fair value per share, given the entry of the Court of Chancery's prior holding in the breach of fiduciary duty damage action involving the same Merger. Consequently, it was entirely appropriate for the Court of Chancery to require the Respondents to demonstrate how [their expert]'s purportedly proper statutory appraisal valuation resulted in only a 90 cents (approximately 2%) per share increase over the legally improper . . . valuation that had included a minority discount.

*Id.* at 520–21.

The defendants read *Le Beau* boldly, claiming it stands for the proposition that whenever an appraisal proceeding and a breach of fiduciary duty action relate to the same merger, any factual determination in one action has preclusive effect in the other. As the defendants see it, the Delaware Supreme Court's ruling dispenses with the need to analyze whether the parties involved were the same or sufficiently related for collateral estoppel to apply. *See* Dkt. 57 at 7, 29–30.

That is not a colorable reading of *Le Beau*. First, *Le Beau* plainly recognized party status as a threshold issue for the application of issue preclusion, noting that "[c]ollateral estoppel prohibits *a party* from relitigating a factual issue that was adjudicated previously." *Le Beau*, 737 A.2d at 520 (emphasis added). The high court's subsequent recitation of the elements for collateral estoppel assumed that the party requirement was met.

Second, the same-party requirement in *Le Beau* was satisfied easily. The question was whether collateral estoppel precluded *the respondents*—Southwest and M.G. Bancorporation—from relitigating the issue decided against Southwest in the fiduciary action. Southwest was a party to both proceedings, so there was no question about the same-party requirement for Southwest. M.G. Bancorporation was not a party in the

52

fiduciary duty action, but Southwest controlled M.G. Bancorporation. *See Restatement*, *supra*, §§ 39, 59(3). Before the short-form merger, Southwest owned 91% of M.G. Bancorporation's stock. After the short-form merger, Southwest owned 100% of M.G. Bancorporation. Preclusion therefore applied under the black-letter rule of law for controlled affiliates.

Contrary to the defendants' assertions, *Le Beau* did not address the application of issue preclusion to successive groups of stockholder plaintiffs. The *Le Beau* opinion accurately observed that the order of the proceedings would not matter for purposes of preclusion, but other considerations certainly would, such as whether the same stockholders were parties to both actions or properly were represented by those who were. For example, if a properly certified class action asserting claims for breach of fiduciary duty proceeded to judgment first, then there would be a strong argument in favor of applying collateral estoppel against all class members. *Le Beau* did not involve these issues.

*Le Beau* thus does not establish a special preclusion rule whenever an appraisal proceeding and a breach-of-fiduciary-duty action relate to the same merger. The defendants' reliance on *Le Beau* is unavailing.

### 6. The Supposedly Different Framework From *Aveta* and *Brevan*

In a second attempt to establish a different framework for preclusion, the defendants maintain that the *Restatement* and *Kohls* are old and outdated, having been superseded by *Aveta* and *Brevan.* Neither decision adopted a different framework for issue preclusion.

The *Aveta* decision involved a dispute between the acquirer of a privately held company and two groups of former stockholders. The "Principal Shareholder Defendants"

53

comprised four individuals who had controlled the privately held company before the acquisition. They had owned high-vote shares that carried a majority of the corporation's voting power; each personally had signed a purchase agreement under which the acquirer purchased their high-vote shares, and they acted together to approve the merger. *Aveta*, 23 A.3d at 164. The purchase agreement appointed one of the four Principal Shareholder Defendants—Bengoa—as the shareholders' representative for all of the stockholders with authority to resolve disputes under the agreement. The "Class B Defendants" consisted of approximately one hundred employees and other individuals. They had owned low-vote shares that carried a minority of the voting power. They did not sign the purchase agreement, nor were they asked to vote in favor of the merger. They simply received the merger consideration after the acquirer and the Principal Shareholder Defendants approved the transaction.

The acquirer prevailed against Bengoa on certain disputes involving the purchase agreement, including the question of whether a subsequent non-binding term sheet had effected a novation of the purchase agreement. The other Principal Shareholder Defendants and certain Class B Defendants then sought to relitigate the novation issue. I held that the Principal Shareholder Defendants were "in privity with Bengoa" and bound by the prior result, reasoning that the Principal Shareholder Defendants had been co-owners of the company with Bengoa, worked closely with him to effectuate the transaction, and signed the purchase agreement appointing him as the shareholder representative. *Id.* at 180.

I next turned to whether the preclusion principles also bound the Class B Defendants. Employing the language on which the defendants now rely, I stated that

"[p]arties are in privity . . . when their interests are identical or closely aligned such that they were actively and adequately represented in the first suit." *Id.* Taken out of context, that language is overly broad and could be read to dispense with the prerequisite that the party have acted as a representative of the non-parties. Under the *Restatement* and as explained in *Kohls*, a representative must have authority to represent the non-party. When the representative party has that authority, then the non-party can avoid preclusion by showing that the parties' interests were not aligned or that the representative did not litigate adequately. *See Kohls*, 791 A.2d at 768–79; *Restatement*, *supra*, §§ 39–40. The absence of an alignment of interests or adequate litigation efforts thus can defeat preclusion; the presence of those factors, standing alone, is not enough to support it.[9]

---

[9] The two Delaware decisions that the *Aveta* decision cited in the supporting footnote involved other considerations that warranted applying preclusion on their facts. *See Orloff*, 2005 WL 3272355; *Wilm. Hous. Auth. v. Nos. 500, 502 & 504 King St., & Nos. 503, 505 & 507 French St., Com. Tr. Co.*, 273 A.2d 280 (Del. Super. 1970). In *Orloff*, the company in question was privately held, with its ownership divided between one family that held a majority stake and other related individuals who constituted "one minority shareholder group." *Orloff*, 2005 WL 3272355, at *8. The successful stockholder plaintiffs were mother and son, and the court found that on the facts presented, "the entire Orloff family has long been intricately intertwined in this litigation." *Id.* at *9. The court discussed alignment of interests, but the principal basis for the holding was the non-party involvement in the prior litigation to a degree sufficient to warrant binding the non-party. *See id.*

In *Wilmington Housing Authority*, the plaintiff prevailed in condemnation proceedings against a commercial trust company that owned various properties as a trustee. The plaintiff subsequently filed suit against the tenant of one of the properties, who raised the same defenses as the trust company. The court held that the tenant was in privity with its landlord by virtue of its leasehold interest. *Wilm. Hous. Auth.*, 273 A.2d at 281. Although this finding was adequate to dispose of the tenant's defenses, the court also noted that the directors and officers of the tenant were "the beneficiaries of the trust agreement" and therefore "held a financial interest in the results of the [prior] case." *Id.* The court then

55

Importantly, the *Aveta* decision did not make a finding of privity, nor did it rely on preclusion to enter judgment against the Class B Defendants. Instead, the decision cautioned against a broad application of privity, quoting *Kohls* on that point. *Aveta*, 23 A.3d at 180. The opinion then relied on *Kohls* for a different proposition: the application of *stare decisis*. As in *Kohls*, the *Aveta* decision ultimately held that *stare decisis* warranted rejecting the Class B Defendants' claims because they had not demonstrated how their claims or arguments differed from Bengoa's. *Id.* at 180–81. The unfortunate sentence from *Aveta* thus constitutes dictum and does not withstand deeper scrutiny.

The defendants also rely on a letter opinion in the *Brevan* case, where this court followed *Aveta* and reasoned similarly. The plaintiff was a preferred stockholder who claimed that the issuer had breached two contractual obligations. Different preferred stockholders previously had sued to enforce the same rights, and the court had entered a final judgment against them based on the doctrine of acquiescence. *Brevan*, 2015 WL 2400712, at *1. The issuer moved to dismiss the complaint, arguing that principles of collateral estoppel and *stare decisis* mandated the same outcome in the second action.

The court granted the motion, holding that as in *Kohls* and *Aveta*, the preferred stockholder had not distinguished its claims in any way from the prior action, such that

---

remarked that "because they are the moving force behind [the tenant] and had the identical interests actively defended in the [prior] case, they bind [the tenant] as a party in privity." *Id.* The court's discussion of these issues was quite brief, but the court's comments seem to have been directed at reinforcing the finding of privity, not providing an independent basis for establishing privity.

*stare decisis* applied. *Id.* at \*3. But the court also quoted the overly broad language from *Aveta* about privity potentially existing based on the alignment of interests between the two groups of plaintiffs and the adequacy of the prior plaintiff's litigation efforts. *Id.* n.14. The decision characterized *Aveta*'s language as the "view adopted in more recent cases," and distinguished *Kohls* as applying "a narrow, contractual view of privity." *Id.* at 3. Based on the *Aveta* test, the *Brevan* court posited that preclusion was available. Because *Brevan* relied on the overly broad dictum from *Aveta*, its observations on privity are subject to the same criticisms. Because *Brevan* held that *stare decisis* applied in any event, the observations were not necessary to the decision and also qualify as dicta.

The language in *Aveta* and *Brevan* about alignment of interests and adequate litigation efforts should not be read as establishing a new test for privity. Such a test would conflict with the black-letter rules in the *Restatement* and would generate due process problems under *Smith v. Bayer* and other federal decisions. The rulings in *Aveta* and *Brevan* do not establish a different or more lenient regime for privity than what the *Restatement* and *Kohls* described.

## B.     Preclusion Versus The Plaintiffs

Under the foregoing legal principles, the plaintiffs are not bound by either (i) the factual findings and legal rulings in the Appraisal Decision or (ii) the legal rulings in the Federal Securities Decision. Those decisions may serve as persuasive authority or apply under the doctrine of *stare decisis*, but neither is preclusive.

57

### 1. The Appraisal Decision

The plaintiffs were not parties to the Appraisal Proceeding. Issue preclusion therefore does not apply unless the defendants can demonstrate that the plaintiffs fall into one of the exceptions to the general rule that non-parties are not bound by a prior adjudication.

The first exception applies when a party validly represented the non-party in the prior proceeding. The only possible basis to invoke this exception would be if the Appraisal Proceeding had been a properly certified class action and the plaintiffs were members of the class. An appraisal proceeding is "in the nature of a class suit,"[10] but the proceeding operates as an opt-in class. *Cf. Berger v. Pubco Corp.*, 976 A.2d 132, 136 (Del. 2009). The judgment that the lead petitioner obtains binds the other appraisal claimants, but not stockholders who did not seek appraisal. The plaintiffs did not seek appraisal, so the actions of the appraisal petitioners did not bind them. Because the appraisal petitioners did not have authority to represent the plaintiffs, it does not matter whether their interests were aligned or whether the appraisal petitioners adequately pursued their claims. Those issues are "largely irrelevant." *Kohls*, 791 A.2d at 769. The first exception therefore does not apply.

---

[10] *Ala. By–Prods. Corp. v. Cede & Co.*, 657 A.2d 254, 260 (Del. 1995); *accord S. Prods. Co., Inc. v. Sabath*, 87 A.2d 128, 134 (Del. 1952); *Sunrise P'rs Ltd. P'ship v. Rouse Props., Inc.*, 2016 WL 7188104, at *4 (Del. Ch. Dec. 8, 2016).

The second exception applies when a party to the prior action and the non-party have a pre-existing legal relationship, separate from the prior litigation, that is sufficient to bind the non-party to the judgment. "Being fellow stockholders is plainly not the type of legal relationship that fits the second exception listed above." *Id.* The second exception therefore does not apply.

The third exception applies when the non-party takes action with respect to the prior litigation that induces a party to believe that the prior adjudication would be binding and, as a result, the party does not take action to bind the non-party to the outcome. Conversely, "[a] person who is excluded as a party prior to the rendition of judgment is not bound as to the claims adjudicated, unless he remains represented by one who is a party. Exclusion as a party may occur where the person's petition to intervene has been rejected." *Restatement*, *supra*, § 34 cmt. b.

Here, the plaintiffs sought to consolidate this fiduciary duty action with the Appraisal Proceeding and to have the two cases tried together. Acting through Columbia, TransCanada opposed the motion. The court agreed with TransCanada. Having excluded the plaintiffs from the appraisal proceeding, TransCanada cannot now contend that the plaintiffs are bound by the Appraisal Decision.

There thus is no basis on which the factual findings and legal conclusions in the Appraisal Decision could have preclusive effect on the plaintiffs in this case. The doctrine of collateral estoppel does not apply to the plaintiffs.

## 2. The Federal Securities Decision

The same principles that prevent the Appraisal Decision from having preclusive effect on the plaintiffs also apply to the Federal Securities Decision. The plaintiffs were not parties to the Federal Securities Action, so issue preclusion does not apply unless the defendants can demonstrate that the plaintiffs fall into one of the exceptions to the general rule.

As with the Appraisal Decision, the first exception could apply only if the Federal Securities Action had been properly certified as a class action. The Federal Securities Action never was certified for class treatment.

As with the Appraisal Decision, the second exception could apply only if a named plaintiff in the Federal Securities Action and the plaintiffs here had a pre-existing legal relationship, separate from the prior litigation, that was sufficient to bind the plaintiffs to the judgment. Here again, "[b]eing fellow stockholders is plainly not the type of legal relationship that fits the second exception listed above." *Kohls*, 791 A.2d at 769.

The third exception could apply only if the plaintiffs had engaged in some conduct in connection with the Federal Securities Action that induced the defendants "reasonably to suppose that the litigation will firmly stabilize the latter's legal obligations." *Restatement*, *supra*, § 62 cmt. c. As in *Kohls*, the defendants have not pointed to any affirmative conduct by the present plaintiffs that caused the defendants to refrain from taking action to bind the present plaintiffs to a judgment in the Federal Securities Action.

The Federal Securities Action does not have prelusive effect for another reason as well. "A judgment is not conclusive in a subsequent action as to issues which might have

60

been but were not litigated and determined in the prior action." Restatement, *supra*, § 27 cmt. e. The District Court expressly disclaimed jurisdiction over the breach of fiduciary duty claims arising under Delaware law. *See Federal Securities Decision*, 405 F. Supp. 3d at 524–25.

There thus is no basis on which the factual findings and legal conclusions in the Federal Securities Decision could have preclusive effect on the plaintiffs in this case. As with the Appraisal Decision, the doctrine of collateral estoppel does not apply.

## IV. THE SALE PROCESS CLAIMS

In their challenge to the sale process, the plaintiffs assert that Skaggs and Smith sought to sell the Company for cash so that they could retire in 2016 with their full change-in-control benefits. The Complaint alleges that once TransCanada emerged as a committed cash bidder, Skaggs and Smith tilted the playing field in favor of TransCanada. They repeatedly allowed TransCanada to breach its standstill agreement, provided TransCanada with confidential information in advance of the January 7 Meeting, briefed TransCanada about the status of the sale process during the January 7 Meeting, delayed releasing other bidders from their standstill agreements, and then favored TransCanada with exclusivity, even during periods when TransCanada's right to exclusivity had terminated. In addition to the formal exclusivity arrangement, Skaggs and Smith gave TransCanada a "moral commitment" that they would not engage with or provide due diligence to any interested party unless the Company received a fully financed, binding offer. That unwritten hurdle was more onerous than the no-shop clause in the eventual Merger Agreement and established a standard that no other party could meet. Based on their moral commitment,

Skaggs and Smith rebuffed Spectra, despite Spectra's status as a serious potential buyer. Although Skaggs and Smith made a show of keeping the Board informed, they misled the Board about key events, such as the true nature of the January 7 Meeting and the delay in releasing other bidders from their standstill agreements. The plaintiffs contend that through these self-interested actions, Skaggs and Smith undercut the Company's leverage with TransCanada and prevented a competing bid from emerging. As a result, the Company was only able to obtain a price of $25.50 per share, rather than the greater consideration that loyal fiduciaries could have obtained.

The Complaint maintains that TransCanada aided and abetted Skaggs and Smith in breaching their fiduciary duties. Knowing that Skaggs and Smith were eager for a deal so that they could retire, TransCanada breached its standstill agreement with impunity, thereby gaining a timing advantage over other bidders. During the January 7 Meeting, TransCanada received confidential information from Smith that a loyal fiduciary would not have provided. TransCanada then used its advantages to obtain exclusivity and extract the unwritten "moral commitment" from Skaggs and Smith. After securing these advantages, TransCanada lowered its bid below the range that it had offered to secure exclusivity and threatened to break off talks and publicly announce the termination of negotiations if the Company did not accept its lowered bid within three days. By knowingly taking advantage of Skaggs' and Smith's breaches of fiduciary duty, TransCanada was able to acquire the Company more cheaply than it otherwise could have.

These allegations state claims on which relief could be granted. It is reasonably conceivable that Skaggs and Smith breached their duty of loyalty and, as a result, the

Company failed to obtain the best value reasonably available to stockholders. Although the claims against TransCanada are weaker, it is reasonably conceivable that TransCanada aided and abetted Skaggs and Smith in breaching their fiduciary duties. The defendants' motion to dismiss the sale process claims therefore is denied.

## A. The Standard Of Review For The Sale Process Claims

The starting point for analyzing a fiduciary breach is to determine the correct standard of review. *See Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014). Delaware corporate law has three tiers of review: the business judgment rule, enhanced scrutiny, and entire fairness. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). The Merger is subject to enhanced scrutiny.

### 1. The Possible Standards Of Review

Delaware's default standard of review is the business judgment rule, a principle of non-review that "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation." *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009). The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Unless one of its elements is rebutted, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010). "Only when a decision lacks any rationally

conceivable basis will a court infer bad faith and a breach of duty." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 34 (Del. Ch. 2014).

"Entire fairness, Delaware's most onerous standard, applies when the board labors under actual conflicts of interest." *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 44 (Del. Ch. 2013). Once entire fairness applies, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor Plenary III*), 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

In between lies enhanced scrutiny, which is Delaware's "intermediate standard of review." *Trados II*, 73 A.3d at 43. It governs "specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors." *Id.* Framed generally, enhanced scrutiny requires that the fiduciary defendants "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007).

In *Revlon*, the Delaware Supreme Court applied the intermediate standard of review to the sale of a corporation. *See Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179–82 (Del. 1986). Enhanced scrutiny applies in this setting because "the

potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful." *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012). Put differently,

> [t]he heightened scrutiny that applies in the *Revlon* (and *Unocal*) contexts [is], in large measure, rooted in a concern that the board might harbor personal motivations in the sale context that differ from what is best for the corporation and its stockholders. Most traditionally, there is the danger that top corporate managers will resist a sale that might cost them their managerial posts, or prefer a sale to one industry rival rather than another for reasons having more to do with personal ego than with what is best for stockholders.

*Dollar Thrifty*, 14 A.3d at 597 (footnote omitted). Consequently, "the predicate question" of the fiduciary's "true motivation" comes into play, and "[t]he court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced" the fiduciary's decision. *Id.* at 598.

To satisfy enhanced scrutiny in an M & A setting, directors must establish both (i) the reasonableness of "the decisionmaking process employed by the directors, including the information on which the directors based their decision" and (ii) "the reasonableness of the directors' action in light of the circumstances then existing." *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 45 (Del. 1994). "Through this examination, the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions." *Dollar Thrifty*, 14 A.3d at 598.

"The reasonableness standard permits a reviewing court to address inequitable action even when directors may have subjectively believed that they were acting properly." *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830–31 (Del. Ch. 2011). The reasonableness standard, however, does not permit a reviewing court to freely substitute its own judgment for the directors' judgment.

> There are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of directors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.

*QVC*, 637 A.2d at 45 (emphasis omitted). Enhanced scrutiny "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith." *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005). "[A]t bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there." *Dollar Thrifty*, 14 A.3d at 595–96.

Because enhanced scrutiny asks whether the directors' conduct fell within a range of reasonableness, what typically drives a finding of breach "is evidence of self-interest, undue favoritism or disdain towards a particular bidder, or a similar non-stockholder-motivated influence that calls into question the integrity of the process." *Del Monte*, 25 A.3d at 831. "[W]hen there is a reason to conclude that debatable tactical decisions were

66

motivated not by a principled evaluation of the risks and benefits to the company's stockholders, but by a fiduciary's consideration of his own financial or other personal self-interests, then the core animating principle of *Revlon* is implicated." *El Paso*, 41 A.3d at 439.

Here, the Merger involved a sale of the Company for cash. Accordingly, enhanced scrutiny provides the standard of review for evaluating the Merger. *See QVC*, 637 A.2d at 45. The plaintiffs thus can state a claim for breach of duty by pleading facts supporting a reasonable inference that the Merger and the process that led to it fell outside the range of reasonableness. *Id.*

### 2. *Corwin* Cleansing

The defendants argue that the business judgment rule applies. As part of a multi-pronged response to an explosion of non-meritorious challenges to mergers, the Delaware Supreme Court held in 2015 that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies." *Corwin*, 125 A.3d at 309. The *Corwin* decision

> stands for the proposition that where the stockholder-owners of a corporation are given an opportunity to approve a transaction, are fully informed of the facts material to the transaction, and where the transaction is not coercive, there is no agency problem for a court to review, and litigation challenging the transaction is subject to dismissal under the business judgment rule.

*In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *1 (Del. Ch. Aug. 31, 2020).

Among other limitations, *Corwin* cleansing applies only when the approval by disinterested stockholders is "fully informed." *Corwin*, 125 A.3d at 308–09. A vote is fully informed when the corporation's disclosures "apprised stockholders of all material

information and did not materially mislead them." *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018). A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The test does not require "a substantial likelihood that [the] disclosure . . . would have caused the reasonable investor to change his vote." *Id.* (same). Rather, the question is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (same).

The defendants ultimately bear "the burden of demonstrating that the stockholders were fully informed when relying on stockholder approval to cleanse a challenged transaction." *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 748 (Del. Ch. 2016), *aff'd*, 156 A.3d 697 (Del. 2017) (ORDER). It nevertheless is "sensible that a plaintiff challenging the decision . . . first identify a deficiency in the operative disclosure document." *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *8 (Del. Ch. Jan. 5, 2017). At that point, "the burden [falls] to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote." *Id.*

At the pleading stage, the operative question is whether the Complaint "supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading." *Morrison*, 191 A.3d at 282. The resulting inquiry is necessarily "fact-intensive, and the Court should deny a motion to dismiss when developing the factual record may be necessary to make a materiality determination as a

68

matter of law." *Chester Cty. Empls.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019).

### a. The Rulings On Disclosure Issues In The Appraisal Decision

The Appraisal Decision found that "the Proxy contained material misstatements and omissions." *Appraisal Decision*, 2019 WL 3778370, at *36. The Appraisal Decision identified three disclosure issues as the "most significant." *Id.* at *35. For purposes of *Corwin* cleansing, these findings and the evidence that supported them give rise to a reasonable pleading-stage inference that the stockholder vote on the Merger was not fully informed.

The first disclosure violation involved "an omission and a misleading partial disclosure about Columbia's NDAs." *Id.*

> The Proxy disclosed that Columbia had entered into NDAs in November 2015 with Parties B, C, and D, but the Proxy did not disclose that the NDAs contained standstills, much less DADWs. The Proxy then disclosed misleadingly that "[u]nlike TransCanada, none of Party B, Party C or Party D sought to re-engage in discussions with [Columbia] after discussions were terminated in November 2015." The Proxy failed to provide the additional disclosure that all four parties were subject to standstills with DADWs, that TransCanada breached its standstill, and that Columbia opted to ignore TransCanada's breach.

*Id.* (alterations in original) (citations omitted). The Appraisal Decision found that "the Proxy created the misleading impression that Parties B, C, and D were not bound by standstills during the pre-signing period." *Id.* The Appraisal Decision also found that the disclosure problems surrounding the standstills were material. *Id.* at *36. "A reasonable stockholder would have found it significant that TransCanada and Parties B, C, and D were bound by standstills in fall 2015 and that TransCanada was permitted to breach its standstill

to pursue the Merger." *Id.* Other Delaware precedent supports the inference that the failure to disclose the DADW standstills was material. *See In Ancestry.com Inc. S'holder Litig.,* Consol. C.A. No. 7988-CS, Dkt. 125 at 233–35 (Del. Ch. Dec. 17, 2012) (TRANSCRIPT) (finding material omission where proxy statement did not disclose the existence of a DADW standstill); *In re Complete Genomics, Inc. S'holder Litig.*, Consol. C.A. No. 7888-VCL, Dkt. 66 at 17–22 (Del. Ch. Dec. 27, 2012) (TRANSCRIPT) (holding that a failure to disclose a DADW standstill constituted a failure to "disclose material information").

The second disclosure issue relates to Skaggs' and Smith's plans to retire in 2016. The Appraisal Decision found that Skaggs and Smith "wanted to [retire] and did." *Appraisal Decision*, 2019 WL 3778370, at *36. The Appraisal Decision further found that "a reasonable stockholder would have regarded their plans as material." *Id.* Delaware precedent supports the inference that the omission of this fact was material. Under Delaware law, stockholders are "entitled to know that certain of their fiduciaries ha[ve] a self-interest that [is] arguably in conflict with their own." *Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1061 (Del. Ch. 1987). This court previously held that a CEO's interest in securing his retirement nest egg was a material fact, noting that

> a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.

70

*In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007). Other precedents support the materiality of information that sheds light on the financial incentives and motivations of key members of management who are involved in negotiating the deal.[11]

The third and most glaring problem was the Proxy's partial disclosure regarding the January 7 Meeting, where "[t]he Proxy failed to mention that Smith invited a bid and told Poirier that TransCanada did not face competition." *Appraisal Decision*, 2019 WL 3778370, at *36. In the Appraisal Decision, the court held that the failure to disclose this information was a material omission. *Id.* Delaware precedent supports the inference that a proxy statement omits material information when it fails to provide a fair and accurate

---

[11] *See, e.g.*, *City of Fort Myers Gen. Empls.' Pension Fund v. Haley*, 235 A.3d 702, 720 (Del. 2020) (holding that complaint stated claim that stockholder vote was not fully informed where proxy failed to disclose CEO's expectation of compensation from bidder in light of its potential effect on his ability to negotiate for the stockholders); *Morrison*, 191 A.3d at 275 (holding that complaint stated claim that Schedule 14D-9 omitted material information where it failed to disclose founder's clear preference for a deal with a particular bidder, including willingness only to rollover shares in a deal with that bidder); *In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *12–13 (Del. Ch. Dec. 10, 2018) (finding that complaint stated claim for breach of the duty of disclosure where proxy failed to disclose bidder's communications with CEO regarding its intent to retain management, including the CEO); *van der Fluit v. Yates*, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017) (declining to apply *Corwin* cleaning where proxy failed to disclose that "Opower negotiators were Yates and Laskey, who each received post-transaction employment and the conversion of unvested Opower options into unvested Oracle options"); *Maric Cap. Master Fund Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1179 (Del. Ch. 2010) (granting preliminary injunction to address proxy's disclosure that there were no compensation "negotiations" between management and the acquirer when there had been "extended discussions" about retaining management and the typical equity incentive package that could be expected, and thus, the proxy statement created "the materially misleading impression that management was given no expectations regarding the treatment they could receive" from the acquirer).

description of significant meetings or other interactions between target management and a bidder.[12]

### b. The Rulings On Disclosure Issues In The Federal Securities Decision

To argue against the existence of disclosure violations that defeat *Corwin* cleansing, the defendants invoke the Federal Securities Decision. In the Federal Securities Action, the federal plaintiffs contended that the Proxy contained material misstatements and omissions in violation of Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9. The federal plaintiffs also asserted a claim for breach of fiduciary duty under Delaware law. The District Court addressed these theories in the Federal Securities Decision. The District Court's analysis diverged from this court's findings in the Appraisal Decision in

---

[12] *See, e.g.*, *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1280–81 (Del. 1994) (reversing a grant of summary judgment in favor of defendants on disclosure claim where proxy failed to disclose the existence of a bid because "once defendants traveled down the road of partial disclosure of the history leading up to the Merger and used the vague language described, they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events," including the existence of the bid); *Firefighters' Pension Sys. of Kansas City v. Presidio, Inc.*, 2021 WL 298141, at *27 (Del. Ch. Jan. 29, 2021) ("It is reasonably conceivable that the existence of the tip was material information that should have been disclosed to the stockholders. The Proxy made no mention of LionTree's tip to BCP."); *Xura*, 2018 WL 6498677, at *13 (holding that plaintiff adequately pled a claim for breach of the duty of disclosure where stockholders appeared to lack information about private communications between CEO and bidders); *Alessi v. Beracha*, 849 A.2d 939, 946 (Del. Ch. 2004) (holding that negotiations between buyers and target's CEO were material when the parties discussed "significant terms" including "valuation"); *see also In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *33–34 (Del. Ch. Oct. 16, 2018) (finding after trial that recommendation statement omitted material information where it failed to disclose a communication between a director and a potential bidder about the bidder's interest in acquiring the company and the likely timeframe for a bid), *aff'd*, 211 A.3d 137 (Del. 2019) (ORDER).

certain respects, and the defendants argue that the Federal Securities Decision is more persuasive.

As a threshold matter, the District Court made a point in the Federal Securities Decision of *not* ruling on the plaintiffs' claims for breach of the fiduciary duty of disclosure under Delaware law. The District Court held that "a determination from the Delaware Chancery Court" on these issues "is much more appropriate" and declined to exercise supplemental jurisdiction over those claims. *Federal Securities Decision*, 405 F. Supp. 3d at 524–25. The Federal Securities Decision thus does not address the specific questions of Delaware law that are pertinent to this proceeding.

The defendants nevertheless assert that the Federal Securities Decision held that the disclosure issues cited in the Appraisal Decision were not material as a matter of law. What the District Court actually held is that the complaint failed to plead any material misstatements or omissions that would render the Proxy false or misleading under the Exchange Act. *Federal Securities Decision*, 405 F. Supp. 3d at 498–99. In reaching this conclusion, the District Court applied the plausibility standard adopted by the Supreme Court of the United States, under which "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The Delaware Supreme Court has rejected plausibility as the pleading standard under Delaware law, emphasizing that "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'" *Cent. Mortg.*, 27 A.3d at 537. For purposes of the motion to dismiss in

the current case, the plaintiffs need only plead facts supporting a possibility of recovery; they need not go further and plead a claim that satisfies the federal plausibility standard.

In ruling on the Section 14(a) claim, the District Court further explained that "when plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, . . . even if they disclaim reliance on a fraud theory." *Federal Securities Decision*, 405 F. Supp. 3d at 506 (omission in original) (alteration and internal quotation marks omitted). The District Court noted that under the Private Securities Litigation Reform Act, a complaint must "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Id.* (quoting 15 U.S.C. § 78u-4). The District Court further explained that a plaintiff can satisfy this standard by meeting "the requirements of Federal Rule of Civil Procedure 9(b)." *Id.* Like Court of Chancery Rule 9(b), the federal rule requires the complaint to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). By contrast, for purposes of the motion to dismiss in the current case, the plaintiffs need not satisfy a pleading standard that requires particularity.

Applying the federal pleading standards, the District Court held that the Proxy's failure to mention the DADW standstills was not a material omission for purposes of federal law. *Federal Securities Decision*, 405 F. Supp. 3d at 516. In reaching this conclusion, the District Court relied heavily on *Kanit v. Elcher*, 264 F.3d 131 (2d Cir. 2001), where the United States Court of Appeals for the Second Circuit found that the

74

failure to disclose the board's decision to release a bidder from a three-year-old standstill restriction did not rise to the level of recklessness because the case did not present "facts indicating a clear duty to disclose." *Id.* at 144. The District Court found *Kanit* persuasive because the federal plaintiffs' claim sounded in fraud and hence was "subject to a heightened pleading standard." *Federal Securities Decision*, 405 F. Supp. 3d at 516.

The District Court's ruling regarding the immateriality of the failure to disclose the DADW standstills does not translate to the current case. The plaintiffs' allegations in this case are not subject to a particularized pleading standard, nor is this court evaluating their plausibility. This decision therefore follows the Delaware precedents regarding the materiality of the failure to disclose the DADW standstills.

The District Court also rejected the claim that the Proxy contained a material omission by failing to disclose that Skaggs and Smith "rush[ed] to sell the Company and retire." *Id.* at 522. Drawing on the Appraisal Decision, the District Court concluded that Skaggs and Smith had not rushed the sale process. The District Court also concluded that the officers' intent to retire "even if material, would likely not significantly alter the total mix [of information]." *Id.* at 523. The District Court further concluded that in light of this court's finding that the fair value of the Company for appraisal purposes was $25.50 per share, "the argument can be made that there was no purported loss." *Id.* n.8.

Again, the District Court's ruling does not translate to the current case. In addition to the differences in pleading standards, the question of whether the vote was fully informed for purposes of *Corwin* cleansing does not involve the element of damages. This decision also is not holding that the Proxy needed to disclose that Skaggs and Smith *rushed*

the sale process, which would involve self-flagellation. Under Delaware precedents, however, the fact that Skaggs and Smith planned to retire to the point of targeting dates in 2016 was a material fact that needed to be disclosed. This decision hews to those precedents.

Finally, the District Court rejected the contention that the Proxy contained a material omission by failing to disclose that TransCanada engaged with the Company in violation of its standstill, including during the January 7 Meeting. The District Court recognized that this conduct could be material, but it concluded that the omissions were similar to a line of federal cases holding that undisclosed discussions with bidders were "not so material as to alter the total mix of information available." *Id.* at 521. Yet again, the analysis does not translate to the current case. The different pleading standards again loom large, and for purposes of Delaware law, a material omission is by definition an omission that alters the total mix of information available. For purposes of Delaware law, the failure to disclose the January 7 Meeting and the preferential treatment that TransCanada received meet the materiality requirement.

### c. The Conclusion Regarding *Corwin* Cleansing

The Complaint tracks the findings in the Appraisal Decision when asserting disclosure claims. Those findings and the evidence that supported them support a reasonably inference that the Proxy contained three material omissions. "[O]ne violation is sufficient to prevent application of *Corwin*." *Yates*, 2017 WL 5953514, at *8 n.115. Accordingly, the *Corwin* doctrine does not lower the standard of review.

76

### 3. The Temporal Starting Point For Enhanced Scrutiny

In a second attempt to avoid enhanced scrutiny, the defendants argue that "*Revlon* duties were not triggered until March 4, 2016, when [the Company] first demanded a written merger proposal from TransCanada." Dkt. 40 at 27. By pushing out the date when so-called "*Revlon* duties" apply, the defendants seek to avoid confronting many of the actions challenged by the plaintiffs, such as the January 7 Meeting, TransCanada's serial breaches of its standstill agreement, and the Board's decision to enter into exclusivity with TransCanada.

As a threshold matter, the notion that *Revlon* imposes particular conduct obligations on directors that manifest themselves as "*Revlon* duties" perpetuates a stereotypical interpretation of *Revlon* that prevailed in the immediate aftermath of that decision. In its landmark 1986 opinion, the Delaware Supreme Court stated that when a board of directors stops resisting a hostile takeover and decides to sell the corporation, the directors' role changes "from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Revlon*, 506 A.2d at 182. That vivid metaphor suggested a set of affirmative conduct obligations (such as a duty to auction) that the Delaware courts would impose and enforce.

Thirty-five years later, that interpretation no longer is viable. As discussed above, *Revlon* now is understood to be a form of enhanced scrutiny, the innovative standard of review created in *Unocal*. The Delaware Supreme court has held squarely and repeatedly that *Revlon* does not create a duty to auction or require that directors adhere to judicially

77

prescribed steps to maximize stockholder value.[13] The Delaware Supreme Court's decision in *Lyondell* dispensed with any lingering uncertainty. There, the Delaware Supreme Court held that the Court of Chancery erred by identifying several possible means by which the directors could have done more to explore alternatives before agreeing to a transaction. *See Lyondell*, 970 A.2d at 242–43. The Delaware Supreme Court viewed the Court of Chancery as having concluded erroneously "that directors must follow one of several courses of action to satisfy their *Revlon* duties." *Id.* at 242. In correcting that error, the Delaware Supreme Court stated that "[n]o court can tell directors exactly how to accomplish [the goal of obtaining the best value reasonably available] because they will be facing a unique combination of circumstances, many of which will be outside their control." *Id.* And if no court can tell directors what to do when pursuing a negotiated acquisition, then *Revlon* cannot impose specific conduct requirements.

---

[13] *See, e.g.*, *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) ("In our view, *Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply."); *see also Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("[T]here are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties."); *QVC*, 637 A.2d at 43 ("The directors' fiduciary duties in a sale of control context are those which generally attach. In short, the directors must act in accordance with their fundamental duties of care and loyalty." (internal quotation marks omitted)); *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989) ("[T]he basic teaching of [*Revlon* and *Unocal*] is simply that the directors must act in accordance with their fundamental duties of care and loyalty."); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 731 (Del. Ch. 1999) ("'*Revlon* duties' refer only to a director's performance of his or her duties of care, good faith and loyalty in the unique factual circumstance of a sale of control over the corporate enterprise.").

78

Enhanced scrutiny in the M & A context addresses the situationally specific pressures that boards of directors, their advisors, and management face when considering a sale or similar strategic alternative that carries significant personal implications for those individuals.[14] For purposes of applying enhanced scrutiny, the operative question is when those situational conflicts come into play. The Delaware Supreme Court has held that this occurs

> in at least the following three scenarios: (1) when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company, (2) where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company, or (3) when the approval of a transaction results in a sale or change of control.

---

[14] *See, e.g.*, *El Paso*, 41 A.3d at 439 ("[T]he potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisers to be less than faithful . . . ."); *Dollar Thrifty*, 14 A.3d at 597 (explaining that "heightened scrutiny" under *Revlon* and *Unocal* applies because of concern about "personal motivations in the sale context that differ from what is best for the corporation and its stockholders" and that "[m]ost traditionally, there is the danger that top corporate managers will resist a sale that might cost them their managerial posts, or prefer a sale to one industry rival rather than another for reasons having more to do with personal ego than with what is best for stockholders"); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 194 (Del. Ch. 2007) (noting that executives may have "an incentive to favor a particular bidder (or type of bidder)," especially if "some bidders might desire to retain existing management or to provide them with future incentives while others might not."); *cf. In re SS & C Techs., Inc. S'holders Litig.*, 911 A.2d 816, 820 (Del. Ch. 2006) (declining to approve disclosure-only settlement where record supported inference that CEO "instigated this transaction through the use of corporate resources, but without prior authorization from the board of directors. . . . in order to identify a transaction in which he could both realize a substantial cash payout for some of his shares and use his remaining shares and options to fund a sizeable investment in the resulting entity").

*Arnold*, 650 A.2d at 1290 (citations and internal quotation marks omitted). Notably, the Delaware Supreme Court made clear that these scenarios are not exclusive ("*at least* the following three scenarios"), and the high court subsequently recognized that enhanced scrutiny applies to "a final-stage transaction for all shareholders." *McMullin v. Beran*, 765 A.2d 910, 918 (Del. 2000).

The Delaware Supreme Court also has recognized that although usually it will be the board that causes the corporation to initiate an active sale process, other corporate actors can take action that implicates enhanced scrutiny. In *McMullin*, it was the company's controlling stockholder. *Id.* at 919. In *RBC Capital Markets, LLC v. Jervis*, it was the chairman of a special committee and the company's financial advisor. 129 A.3d 816, 851–52 (Del. 2015). Rejecting the financial advisor's argument that enhanced scrutiny could not begin to apply until late in the sale process, after the board had definitive offers from two bidders, the Delaware Supreme Court reasoned that "to sanction [the financial advisor's] contention would allow the Board to benefit from a more deferential standard of review during the time when, due to its lack of oversight, the Special Committee and [the financial advisor] engaged in a flawed and conflict-ridden sale process." *Id.* at 853–54. The high court noted that "'*Revlon* requires us to examine whether a board's overall course of action was reasonable,'" not just the end product. *Id.* at 854 (quoting *C&J Energy Servs., Inc. v. City of Miami Gen. Empls.'*, 107 A.3d 1049, 1066 (Del. 2014)).

The defendants have moved to dismiss the Complaint for failing to state a claim on which relief could be granted, making the operative question, "When is it reasonably conceivable that the situational conflicts that animate enhanced scrutiny could have come

into play?" For purposes of the motion to dismiss, the pled facts support a reasonable inference that enhanced scrutiny is warranted beginning not later than the January 7 Meeting. Indeed, although this decision does not rely on an earlier date, it is reasonably conceivable that enhanced scrutiny could have started to apply as early as July 2015, when NiSource completed the spinoff and the Company emerged as a public entity. Given the pled facts, it would be reasonable to view the situational pressures that animate enhanced scrutiny as having come into play immediately after the spinoff.

The pled facts support a reasonable inference that Skaggs and Smith began contemplating a sale of the Company before the spinoff was completed, providing strong support for an inference that the situational pressures would soon become manifest.

- In May 2015, Lazard gave a presentation to Company management about the Company's strategic alternatives. The presentation identified possible acquirers, including Dominion, Berkshire, Spectra, and NextEra.

- Later in May 2015, Lazard contacted TransCanada and mentioned that the Company might be for sale shortly after the spinoff. In June, Lazard advised TransCanada against opening a dialogue with the Company until after the spinoff, warning that it could jeopardize the tax-free status of the transaction.

- In a May 2015 memorandum, Skaggs' personal financial advisor stated that the Company "could be purchased as early as Q3/Q4 of 2015." Compl. ¶ 39. He wrote, "I think they are already working on getting themselves sold before they even split. This was the intention all along. [Skaggs] sees himself only staying on through July of 2016." *Id.* (alteration in original) (emphasis omitted).

The pled facts, supported by evidence from the Appraisal Proceeding, support a reasonable inference that immediately after the spinoff, the Company began engaging with potential bidders and exploring alternatives in a context where enhanced scrutiny would apply.

- Less than a week after the spin-off, the CEO of Spectra contacted Skaggs to express interest in a deal.

- On July 20, 2015, Dominion expressed interest in buying Columbia for $32.50 to $35.50 per share.

- On August 12, 2015, Columbia and Dominion executed an NDA, and Dominion began due diligence.

- In October 2015, Smith spoke with TransCanada, and Skaggs engaged in further talks with Dominion.

- In early November 2015, Columbia entered into NDAs with Dominion, NextEra, and Berkshire, and the potential buyers began conducting due diligence.

- On November 19, 2015, Skaggs and Smith invited TransCanada and Berkshire to make a bid by November 24. They did not provide the bid deadline to the other bidders.

- After receiving indications of interest from TransCanada and Berkshire, the Board decided to pursue an equity offering.

Although it is possible to view the Company's sale process as having started with the spinoff, this decision does not draw that inference. Instead, this decision finds it reasonably conceivable that enhanced scrutiny began to apply not later than the January 7 Meeting, when Smith provided confidential information to Poirier, indicated that management had eliminated TransCanada's competition, and invited a bid. These events led directly to the Merger Agreement and the sale of the Company for cash. The pled facts that support this inference include events leading up to, during, and after the January 7 Meeting.

- In mid-December 2015, Poirier called Smith to reiterate TransCanada's interest in a deal. Smith and Poirier agreed to the January 7 Meeting.

- During the same time frame, Skaggs began meeting with individual members of the Board to encourage them to support a sale.

- On January 5, 2016, Smith emailed Poirier 190 pages of confidential information.

- During the January 7 Meeting. Smith encouraged TransCanada to bid, conveying the message that Columbia had "eliminated the competition." *Id.* ¶ 84.

- On January 25, 2016, TransCanada expressed interest in a transaction in the range of $25 to $28 per share.

- During a two-day meeting on January 28 and 29, 2016, Skaggs sought to persuade the Board to enter into a deal with TransCanada. The Board directed management to grant TransCanada exclusivity through March 2, 2016.

- On March 4, 2016, the Board directed management to demand a formal merger proposal from TransCanada. The Board also instructed Skaggs and Smith to waive the standstill provisions in the NDAs between Columbia and the other potential bidders. Skaggs and Smith ignored the Board's direction and did not inform the other bidders that the Board was waiving their standstill provisions.

- On March 11, 2016, Spectra emailed Skaggs to start merger talks. Skaggs downplayed the seriousness of Spectra's interest and agreed on a script with TransCanada that would insist on a serious written proposal. Skaggs and Smith gave TransCanada a "moral commitment" that the phrase "serious written proposal" meant a "financed bid subject only to confirmatory" diligence. *Id.* ¶ 108.

- Also on March 11, 2016, the Board repeated its direction that management waive the standstills with Berkshire, Dominion, and NextEra. Skaggs and Smith delayed sending the emails until the following day.

- On March 14, 2016, TransCanada lowered its offer from $26 to $25.50 and threatened to make a public announcement that talks had terminated unless the Company accepted its bid within three days.

- On March 16, 2016, the Board approved the Merger Agreement.

- The post-signing phase ended on July 1, 2016, when the Merger closed.

Given these events, it is reasonable to infer that Smith initiated a sale process through the January 7 Meeting. The Board could have stopped the sale process that Smith initiated, but Skaggs and Smith convinced the Board to proceed. Three months later, that process

resulted in the Merger Agreement. It is reasonable to infer that enhanced scrutiny applies to the events that occurred during this period, as well as during the post-signing phase.

### 4. The Sale Process Under Enhanced Scrutiny

When the sale process is evaluated under enhanced scrutiny beginning with the January 7 Meeting, the Complaint pleads facts supporting a reasonable inference that Skaggs and Smith persistently favored TransCanada so that they could achieve a near-term cash sale and retire with their full change-in-control benefits. At the pleading stage, it is reasonably conceivable that the sale process fell outside the range of reasonableness and generated a price below what TransCanada or another bidder otherwise would have paid. Put differently, the Complaint supports a reasonable inference that the sale process did not achieve "the best value reasonably available to the stockholders." *QVC*, 637 A.2d at 43.

A board of directors may favor a bidder if "in good faith and advisedly it believes shareholder interests would be thereby advanced." *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *14 (Del. Ch. Aug. 8, 1988) (Allen, C.). "[A] board may not favor one bidder over another for selfish or inappropriate reasons . . . ." *Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *14 (Del. Ch. Dec. 10, 1998). "[A]ny favoritism [directors] display toward particular bidders must be justified solely by reference to the objective of maximizing the price the stockholders receive for their shares." *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 64 (Del. Ch. 2007). A board "may tilt the playing field if, but only if, it is in the shareholders' interest to do so." *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 782 (Del. Ch. 1988).

By contrast, it falls outside the range of reasonableness to tilt the playing field against one bidder and in favor of another, not in a reasoned effort to maximize advantage for the stockholders, but because the fiduciaries have personal reasons to prefer the favored bidder. *See Topps*, 926 A.2d at 64. Consequently, "the paradigmatic context for a good *Revlon* claim . . . is when a supine board under the sway of an overweening CEO bent on a certain direction[] tilts the sales process for reasons inimical to the stockholders' desire for the best price." *Toys "R" Us*, 877 A.2d at 1002. Vice Chancellor McCormick recently reframed this observation more broadly to state that "the paradigmatic *Revlon* claim involves a conflicted fiduciary who is insufficiently checked by the board and who tilts the sale process toward his own personal interests in ways inconsistent with maximizing stockholder value." *In re Mindbody, Inc.*, 2020 WL 5870084, at *13 (Del. Ch. Oct. 2, 2020).

The factual allegations of the Complaint support a reasonable inference that Skaggs and Smith tilted the sale process in favor of TransCanada and against the other bidders so that they could obtain a cash deal that would enable them to retire with their change-in-control benefits. The favoritism that TransCanada received was persistent and substantial.

The favoritism towards TransCanada began in mid-December, in the lead-up to the January 7 Meeting, when Poirier called Smith to reiterate TransCanada's interest in a deal with Columbia. As a result of the call, Smith scheduled the January 7 Meeting with Poirier. Smith told Skaggs about Poirier's outreach, and they shared the information with Goldman. When Poirier made the call, TransCanada was bound by a standstill with a DADW provision, and Poirier's call violated the standstill. No one told the Board, and the Company

did not take any action to enforce the standstill. Although the favoritism during this timeframe precedes the time when this decision assumes that enhanced scrutiny began to apply, it provides context for what followed.

The January 7 Meeting that kicked off the renewed sale process itself was an act of management-led favoritism towards TransCanada. On January 5, 2016, in anticipation of the January 7 Meeting, Smith emailed Poirier 190 pages of confidential information, including the Company's updated financial projections and its counterparty agreements. At the time, an abiding trough in commodity prices had caused market participants to question whether midstream energy companies like Columbia faced near-term counterparty risk, meaning that oil and gas companies might not be able to make their payments under their long-term, fixed-price, take-or-pay contracts if commodity prices remained low. By giving Poirier the Company's customer agreements and an updated set of projections, Smith provided TransCanada with critical information that enabled TransCanada to assess the Company's value and make a bid. Information is costly to obtain, and when a seller gives a bidder preferential access to information, it subsidizes that bidder's efforts. *See* Jacob K. Goeree & Theo Offerman, *Competitive Bidding in Auctions with Private and Common Values*, 113 Econ. J. 598, 600 (2003).

During the January 7 Meeting, the favoritism towards TransCanada became more blatant. Skaggs, Smith, and Goldman had prepared a set of talking points for Smith to use with TransCanada. Instead of deploying the talking points as intended, Smith literally handed them to Poirier. Smith then stressed that TransCanada was unlikely to face

competition from any major strategic players, because Columbia had "eliminated the competition." Compl. ¶ 84.

It is reasonable to infer that the January 7 Meeting undercut the Company's ability to negotiate the best value reasonably available from TransCanada. The Board had not authorized Smith to meet with TransCanada, much less to give TransCanada non-public information plus advice on how to avoid a competitive sale process. Skaggs and Smith never told the Board the full story about the January 7 Meeting or Smith's unauthorized disclosures. Although Skaggs generally was forthcoming with the Board, in this instance he told the directors that TransCanada had reached out to Smith, without mentioning that Smith met with Poirier and without reporting Smith's unauthorized disclosures. *See Appraisal Decision*, 2019 WL 3778370, at *33.

After the January 7 Meeting, the favoritism towards TransCanada continued. During a two-day meeting on January 28 and 29, 2016, Skaggs attempted to persuade the Board to pursue a deal with TransCanada. His presentation overstated the near-term risks to Columbia and its business plan and claimed that for the directors to reject a price of $26 per share, they needed to believe that the Company's stock price would reach $30.11 per share in the next year. In reality, the underlying analysis indicated that the directors only needed to believe that the Company's stock price would reach $30.11 per share *in the next twenty-three months*. To reject a price of $26 per share, they only had to believe that the Company's stock price would reach $27.95 per share by the end of 2016. Only five months earlier, the Company's stock price had traded above $27 per share.

87

Based on Skaggs' presentation, the Board authorized management to grant exclusivity to TransCanada through March 2, 2016, and that agreement subsequently was extended until March 8. During the exclusivity period, sixty-nine TransCanada employees conducted due diligence on the Company.

On March 4, 2016, the Board directed management to demand a formal merger proposal from TransCanada. The Board also instructed Skaggs and Smith to waive the standstill provisions in the NDAs between Columbia and the other potential bidders. Skaggs and Smith did not carry out that instruction until over a week later, on March 12, after the Board reiterated its directive. It is reasonable to infer that Skaggs and Smith failed to carry out the Board's instructions because they favored a deal with TransCanada.

On March 8, 2016, TransCanada's exclusivity expired. On March 9, TransCanada offered to acquire the Company for $26 per share. On March 10, the *Wall Street Journal* broke a story about the talks. Skaggs reminded the Board that the exclusivity period had expired and that the news story could lead to additional inbound offers.

On March 11, 2016, Spectra contacted Skaggs to pursue merger talks, but Skaggs downplayed the seriousness of Spectra's interest. Rather than engaging with Spectra and using the threat of competition to negotiate a higher bid from TransCanada, Skaggs offered to act as if TransCanada's exclusivity arrangement had never ended and would continue for another week, conditioned on TransCanada agreeing that the Company could tell interested parties that it would respond only to a "serious written proposal." That negotiating position favored TransCanada's interests. Nevertheless, TransCanada demanded a "moral commitment" from Skaggs and Smith that the phrase "serious written

proposal" meant a "financed bid subject only to confirmatory" diligence. Compl. ¶ 108.

Skaggs agreed, and Smith understood this concept to require

> [a] bona fide proposal that says I will pay you X for your company. Hard and fast. No outs. No anything. No way to wiggle out of anything. This is going to happen. You're going to pay whatever you're going to pay per share and we're going to sign that agreement and we're done.

*Id.* ¶¶ 12, 109, 128.

By making this moral commitment, Skaggs and Smith established a requirement that arguably was more onerous than the no-shop clause in the eventual Merger Agreement. Under the no-shop provision, the Company could provide information to or engage in discussions with any person who made a bona fide written Acquisition Proposal, defined as any proposal or offer involving 15% or more of the Company's equity or assets, without any requirement that the Acquisition Proposal be fully financed, binding, and actionable. *See* MA §§ 4.02(a)–(b). Before doing so, the Board had to determine in good faith that the failure to do so "would reasonably be expected to result in a breach of the directors' fiduciary duties" and that the Acquisition Proposal either constituted "or could reasonably be expected to result in" a Superior Proposal. *Id.* § 4.02(a). The definition of "Superior Proposal" contemplated an acquisition or purchase involving 50% or more of the Company's equity or assets that was "reasonably likely to be consummated in accordance with its terms." *Id.* § 4.02(b)(ii). The definition of "Superior Proposal" permitted the Board to consider whether the proposal was contingent on third-party financing, but did not require a fully financed, binding offer with no outs.

The moral commitment that Skaggs and Smith gave to TransCanada imposed a standard that no competing bidder could meet. With the dislocation in the energy markets, no bidder would make a proposal that met this test without conducting due diligence. TransCanada deployed nearly seventy people who conducted diligence for over a month before making its offer of $26 per share.

After making their moral commitment to TransCanada, Skaggs and Smith brushed off Spectra's interest. They referred Spectra's CFO to Goldman, who read the script. Spectra's CFO told Goldman that Spectra could "move quickly" and "be more specific subject to diligence." Compl. ¶ 114. The script and management's "moral commitment" to TransCanada foreclosed that option; Spectra would need to provide a fully committed proposal before getting any diligence. Goldman believed that Spectra was a serious bidder, but Skaggs and Smith would not engage.

These events culminated on March 14, 2016, when TransCanada lowered its price from $26 to $25.50. TransCanada placed a three-day deadline on its offer and threatened to make a public announcement that negotiations had terminated if the Company did not accept by the deadline. A public announcement of that sort could suggest that TransCanada had uncovered problems with Columbia, turning Columbia into damaged goods and hurting Columbia's ability to secure an alternative transaction. It is reasonable to infer that the solicitude that Skaggs and Smith showed towards TransCanada contributed to TransCanada's decision to lower its bid.

TransCanada's lower offer caused the exclusivity agreement to terminate and freed the Company to engage with other bidders, but the Company did not take advantage of the opportunity. On March 16, 2016, the Board approved the Merger Agreement.

At the pleading stage, this pattern of behavior supports a reasonable inference that Skaggs and Smith tilted the playing field towards TransCanada in pursuit of a cash deal that would maximize the value of their retirement benefits. It is reasonable to infer that without the favoritism that Skaggs and Smith showed to TransCanada, the Company would have had greater negotiating leverage vis-à-vis TransCanada, either as a result of developing other alternatives or simply because Company management would not have signaled so strongly that they wanted a deal. It is reasonable to infer that the Company could have extracted a better price from TransCanada or obtained a superior deal from a third party, such as Spectra.

## 5.    The Appraisal Decision's Findings Regarding The Sale Process

To argue that the factual allegations of the Complaint do not support a reasonable inference that the sale process fell short under enhanced scrutiny, the defendants return to the Appraisal Decision, stressing that this court held in the Appraisal Decision that the Board oversaw a sale process that resulted in a transaction price that provided reliable evidence of fair value. Arguing that the rulings in the Appraisal Decision require dismissal under the doctrine of *stare decisis*, the defendants contend that this finding necessarily means that the sale process could not have been inadequate.

The defect in this argument is that the Appraisal Decision focused exclusively on whether the sale process "was sufficiently reliable to make the deal price a persuasive

91

indicator of fair value." *Appraisal Decision*, 2019 WL 3778370, at *24. The Appraisal Decision did not examine whether the sale process resulted in "the best value reasonably available for the stockholders." *QVC*, 637 A.3d at 46. As a result, the Appraisal Decision did not evaluate the possibility of a fiduciary breach based on the prospects for a better price from TransCanada or a higher bid from a third party.

To state the obvious, the Appraisal Decision was rendered in the context of a statutory appraisal proceeding. "An appraisal is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings." *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186 (Del. 1988). Under the appraisal statute, fair value means the value of the company as a standalone entity.[15] To determine the company's fair value, the court values the corporation as a going concern based on its operative reality at the point in time when the merger closed.[16] The court looks

---

[15] *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 20 (Del. 2017) (explaining that when valuing a corporation in an appraisal, "the court should first envisage the entire pre-merger company as a 'going concern,' as a standalone entity, and assess its value as such" (quoting *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989)); *accord Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.,* 240 A.3d 3, 10 (Del. 2020); *In re Appraisal of AOL Inc.,* 2018 WL 1037450, at *8 (Del. Ch. Feb. 23, 2018).

[16] *Le Beau*, 737 A.2d at 525 (explaining that in an appraisal, the corporation "must be valued as a going concern based upon the 'operative reality' of the company at the time of the merger") (quoting *Cede & Co. v. Technicolor, Inc. (Technicolor IV)*, 684 A.2d 289, 298 (Del. 1996)); *see Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 132–33 (Del. 2019) ("Fair value is . . . the value of the company to the stockholder as

92

to the company's standalone value as a going concern because "[t]he underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had the merger not occurred."[17] In summary, the trial court assesses "the value of the company . . . as a going concern, rather than its value to a third party as an acquisition." *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1999).

As recently as four months before the issuance of the Appraisal Decision, the Delaware Supreme Court had released the third installment in a trilogy of rulings that provided pointed guidance as to how a trial court should approach the relationship between

---

a going concern," i.e., the stockholder's "proportionate interest in a going concern." (internal quotation marks omitted)).

[17] *Technicolor IV*, 684 A.2d at 298; *see Tri-Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950) ("The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern."). The going-concern standard also tracks the judicially endorsed account in which the appraisal statute arose "as a means to compensate shareholders of Delaware corporations for the loss of their common law right to prevent a merger or consolidation by refusal to consent to such transactions." *See, e.g.*, *Ala. By-Prods.*, 657 A.2d at 258. As explained in the seminal Delaware Supreme Court decision on the going-concern standard, the appraisal statute calls for valuing the corporation as a going concern, using its operative reality as it then existed as a standalone entity, because that is the alternative that the dissenters wished to maintain. *Battye*, 74 A.2d at 72. Commentators have questioned the accuracy of the historical trade-off, but it remains part of the foundational understanding that has informed the concept of fair value. *See* Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 130 n.52 (2005) ("The historical accuracy of this trade-off story is questionable, however, given the fact that the appraisal remedy was often added well after the adoption of statutes permitting mergers without unanimous consent." (citing Robert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law*, 84 Geo. L.J. 1, 14 (1995))).

fair value in an appraisal and the deal price in a third-party transaction that offered a premium over the unaffected market price.[18] The Delaware Supreme Court stressed that "[t]he issue in an appraisal is not whether a negotiator has extracted the highest possible bid. Rather, the key inquiry is whether the dissenters got fair value and were not exploited." *Dell*, 177 A.3d at 33. "[F]air value is just that, 'fair.' It does not mean the highest possible price that a company might have sold for had Warren Buffett negotiated for it on his best day...." *DFC*, 172 A.3d at 370.

> Capitalism is rough and ready, and the purpose of an appraisal is not to make sure that the petitioners get the highest conceivable value that might have been procedure had every domino fallen out of the company's way; rather, it is to make sure that they receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction.

*Id.* at 370–71.

With these principles in mind, the Appraisal Decision focused on "fair value" for purposes of an appraisal. *See Appraisal Decision*, 2019 WL 3778370, at *14–17 (quoting 8 *Del C.* § 262(h) and discussing valuation standard). Adhering to the standards set forth

---

[18] *See Aruba*, 210 A.3d at 142 (reversing trial court's finding on fair value and determining fair value using deal price less the acquirer's estimate of synergies); *Dell*, 177 A.2d at 23 (reversing trial court's finding on fair value where sale process was sufficiently good that the deal price deserved "heavy, if not dispositive, weight"); *DFC Glob. Corp. v. Muirfield Value P'rs*, 172 A.3d 346, 388–89 (Del. 2017) (reversing trial court's finding on fair value where sale process was sufficiently good that the Court of Chancery's "decision to give one-third weight to each metric was unexplained and in tension with the Court of Chancery's own findings about the robustness of the market check"). The Delaware Supreme Court issued its decision in *Aruba* on April 16, 2019. This court held post-trial oral argument in the Appraisal Proceeding on May 16, 2019, and issued its decision on August 12, 2019.

in *Dell*, *DFC*, and *Aruba*, the Appraisal Decision evaluated whether the petitioners had been exploited in the sense of being deprived of what would fairly be given to them in an arm's-length transaction. After surveying the high court trilogy, the Appraisal Decision noted that when applying the arm's-length transaction test, the Delaware Supreme Court had cited "objective indicia" of arm's-length status. *Id.* at *24 (citing *Dell*, 177 A.3d at 28, and *DFC*, 172 A.3d at 376). These indicia included:

- Whether the acquirer was a third party, *see id.* at *25 (citing *DFC*, 172 A.3d at 349);

- Whether the Board had a majority of disinterested and independent directors, *see id.* (citing *Dell*, 177 A.3d at 28);

- Whether the acquirer conducted due diligence and received confidential information, *see id.* (citing *Aruba*, 210 A.3d at 140);

- Whether the target and the buyer negotiated over the price, *see id.* (citing *Aruba*, 210 A.3d at 139; and *Dell*, 177 A.3d at 28);

- Whether the target contacted other buyers who declined to pursue a transaction during the pre-signing phase, *see id.* (citing *Aruba*, 210 A.3d at 136–39, 142; *Dell*, 177 A.3d at 28, and *DFC*, 172 A.3d at 350, 376); and

- Whether any bidders emerged during the post-signing phase, *see id.* (citing *Aruba*, 210 A.3d at 136; *Dell*, 177 A.3d at 29, 33).

The Appraisal Decision deployed these objective indicia when determining whether the deal price provided a reliable indication of standalone value. The Merger exhibited these objective indicia, and the Appraisal Decision therefore regarded the deal price as a reliable indicator of standalone value.

The use of these relatively straightforward factors as a heuristic for evaluating a transaction makes sense when the question is whether the deal price establishes a persuasive upper bound on standalone value. As the Delaware Supreme Court has noted,

95

"it is widely assumed that the sale price in many M & A deals includes a portion of the buyer's expected synergy gains, which is part of the premium the winning buyer must pay to prevail and obtain control." *DFC*, 172 A.3d at 371. A deal that exhibits the objective indicia cited by the Delaware Supreme Court and which reflects a premium over the unaffected trading price therefore likely exceeds standalone value. Real-world market realities make it unlikely that delving deeper into the transactional dynamics would uncover a deal price below standalone value.

The same straightforward factors may not be dispositive when evaluating whether a deal price provides "the best value reasonably available to the stockholders." *QVC*, 637 A.2d at 43. Because of the limitations of an appraisal proceeding, the court does not evaluate the possibility of a higher negotiated price or the potential for an offer from an alternative bidder, except to the extent that those factors touch on the relationship between the deal price and standalone value. In this instance, the Appraisal Decision did not evaluate whether the sale process resulted in the best value reasonably available to stockholders, and the Appraisal Decision did not determine whether management's conduct undermined the Board's ability to obtain a higher price from TransCanada or a different bidder. The outcome in the Appraisal Proceeding therefore does not defeat the reasonable inference of an enhanced scrutiny breach under the doctrine of *stare decisis*.

### 6. The Appraisal Decision's Findings Regarding Specific Flaws In The Sale Process

In addition to invoking the bottom-line conclusion in the Appraisal Decision, the defendants also rely on its analysis of various flaws in the sale process, asserting in each

96

case that the Appraisal Decision found that the flaw did not taint the result. The problem again for the defendants is that in each case, the Appraisal Decision examined the factual record to determine whether the alleged flaw undermined the reliability of the deal price as a persuasive indicator of standalone value using the criteria that the Delaware Supreme Court deployed in *Aruba*, *Dell*, and *DFC*. The court did not evaluate whether the flaws prevented the Board from securing the best value reasonably available for stockholders in the sense of a higher price from TransCanada or a better deal from a competing bidder.

First, the court considered whether Skaggs and Smith initiated and then influenced the sale process to generate personal benefits. The Appraisal Decision noted that both executives had targeted a 2016 retirement date, that both had change-in-control agreements that paid out triple the sum of their base salary and target annual bonus if they retired after a sale of Columbia, but if the sale occurred after July 1, 2018, then the multiple would drop from triple to double. The Appraisal Decision observed that when Columbia separated from NiSource, both joined Columbia knowing that it was likely to be an acquisition target, and that both had made statements that evidenced their desire for an imminent sale. The Appraisal Decision found that Skaggs and Smith in fact harbored conflicting interests, but for purposes of measuring the deal price against standalone value, the Appraisal Decision evaluated the seriousness of their conflicts against the conflicts of interest present in *Aruba* and *Dell*, which had not been sufficient to undermine the reliability of the deal price as an indicator of standalone value. The Appraisal Decision ultimately rejected the idea that Skaggs' and Smith's conflicts resulted in a deal price below standalone value, holding that Skaggs and Smith "were not going to arrange a fire sale for below Columbia's standalone

97

value, and the Board would not have let them." *Appraisal Decision*, 2019 WL 3778370, at *28. The Appraisal Decision did not consider the conflicts in terms of whether the sale process achieved the best value reasonably available to stockholders.

The Appraisal Decision considered the January 7 Meeting from a similar perspective. Describing this meeting as the "most troubling event in the deal timeline," the court found that there was "some evidence" that the Board might have negotiated a higher price without Smith's tip. *Id.* at *29. But relying on the Delaware Supreme Court's observation in *Dell* that fair value is not a measure of "whether a negotiator has extracted the highest possible bid," the Appraisal Decision concluded that the prospect of a higher deal price was "insufficient to undermine the deal price for appraisal purposes." *Id.* (quoting *Dell*, 177 A.3d at 33). As the decision explained,

> The evidence does not convince me that the Skaggs, Smith, and the Board accepted a deal price that left a portion of Columbia's fundamental value on the table. As in *Aruba*, perhaps different negotiators could have done better. If they had, then the higher price would have resulted in TransCanada sharing a portion of the anticipated synergies with Columbia's stockholders. It would not have affected whether Columbia's stockholders received fair value.

*Id.* at *29. The Appraisal Decision did not make any finding about the effect of Smith's tip on the Board's ability to obtain the best value reasonably available, whether from TransCanada or another bidder.

Next, the court considered whether the Company's favoritism of TransCanada undermined the persuasiveness of the deal price as an indicator of standalone value. The Appraisal Decision described various instances of favoritism, including the January 7 Meeting, the decision to grant exclusivity to TransCanada, and the decision to treat the

exclusivity agreement as remaining in place even after it had terminated. The Appraisal Decision compared these events with the facts of *Aruba* and *DFC*, concluding that the problems during the pre-signing phase were comparable to what had been present in those decisions. The Appraisal Decision found that "[a]s with their arguments about management incentives, the petitioners have mustered evidence that supports their theory of bidder favoritism, but they failed to show that Columbia favored TransCanada *to a degree that left fundamental value on the table*." *Id.* at *31 (emphasis added). The Appraisal Decision did not make a determination as to whether the persistent favoritism of TransCanada undercut the Company's negotiating leverage vis-à-vis TransCanada and hurt the Company's ability to extract a higher price.

Relatedly, the court examined the effect on the sale process of the Company's treatment of its standstills. The petitioners argued that Columbia permitted TransCanada to breach its standstill, while at the same time failing to waive the standstills that bound rival bidders. Although the Board ultimately waived the standstills for the three other bidders, the petitioners argued that by the time it did so, TransCanada had an insurmountable head start towards a transaction. The Appraisal Decision found that "TransCanada breached its standstill several times." *Id.* at *32. The Appraisal Decision noted that although Columbia did not waive the standstills for the other bidders in March 2016, those other bidders could have bid during the post-signing phase. For purposes of the Merger's exposure to potential overbids during the post-signing phase, the sale process resembled the passive market checks that the Delaware Supreme Court endorsed in *Aruba* and *DFC*. *Id.* The court concluded that for purposes of validating the sale price as an upper

bound on standalone value, the Company's treatment of its standstills did not undermine the deal price. *Id.* at \*33.

The Appraisal Decision also considered the petitioners' arguments that "Skaggs and Smith misled the Board or otherwise ran the sale process unsupervised." *Id.* The court accepted that there might be a situation in which "fraud on the board could lead to a deal price below fair value," but found that the petitioners' arguments did not support that argument on the facts presented. *Id.* Instead, if credited, the petitioners' arguments "would show that the Board could have gotten more than fair value, but they would not show that the deal price fell below that mark." *Id.* (citing *DFC*, 172 A.3d at 370).

When analyzing the petitioners' specific arguments about fraud on the Board, the Appraisal Decision largely rejected the petitioners' assertions that Skaggs misled the Board during the period leading up to the equity offering in December 2015. The decision recognized that evidence existed to support the petitioners' theory, but concluded that "[t]he better view of the evidence" was that Skaggs broadly sought to generate interest before the Company pivoted to its equity offering in December. *Id.* By contrast, the Appraisal Decision credited the petitioners' claims about the January 7 Meeting, noting that during this meeting,

> Smith sent Poirier confidential due diligence materials and assured him that TransCanada faced no competition. The Board did not authorize the meeting or the disclosures. And although Skaggs generally was forthcoming with the Board, in this instance Skaggs told the Board that TransCanada had reached out to Smith, without mentioning that Smith met with Poirier and without reporting Smith's unauthorized disclosures.

*Id.* (footnote omitted). The court nevertheless found that the petitioners had failed to prove that Smith's tip and the officers' partial description of the meeting "led to a price below fair value." *Id.* at *34. The court did not address whether or not these factors affected the Board's ability to obtain the best value reasonably available to stockholders.

Finally, the court considered whether the deal protection measures in the Merger Agreement called into question the reliability of the deal price as an indicator of standalone value. The court found that the deal protections "did not undermine the sale process for appraisal purposes." *Id.* at *40. The language of this portion of the Appraisal Decision is the most favorable for the defendants, because the court referenced commentators who have perceived "that under the Delaware Supreme Court's recent appraisal decisions, a sale process will function as a reliable indicator of fair value if it would pass muster if reviewed under enhanced scrutiny in a breach of fiduciary duty case." *Id.* The court then observed that "[t]he combination of deal protection measures would not have supported a claim for breach of fiduciary duty." *Id.* And that remains true: a challenge to the sale process based on the deal protection measures alone would not state a claim for breach of fiduciary duty.

The current plaintiffs, however, do not challenge the deal protection measures alone. They challenge the sale process as a whole, including the January 7 Meeting. Notably, the current plaintiffs do not contend that the officers breached their fiduciary duties by inducing the Board to accept a price below standalone value or otherwise to forego a standalone alternative. They contend that the officers breached their fiduciary duties by inducing the Board to accept a price from TransCanada that was not the best value reasonably available.

At this stage of the case, it is not clear as a matter of law that the post-signing market check described in the Appraisal Decision could validate the Merger for purposes of enhanced scrutiny. At a minimum, the termination fee and expense reimbursement create uncertainty about the outcome. Assuming a topping bidder wanted to make a superior proposal, if the Company terminated the Merger Agreement, then the Company would have to pay TransCanada a termination fee of $309 million, or seventy-seven cents per share, plus expense reimbursement capped at $40 million representing another ten cents per share. Those amounts would reduce the Company's value to the acquirer, eliminating any incentive for any acquirer to bid unless the acquirer valued the Company at more than $26.37 per share. Skaggs and Smith thus could have cost the stockholders up to $349 million, and TransCanada could have benefitted by that amount, without market forces coming into play as a corrective.

The later stages of the negotiations with TransCanada involved pricing increments of fifty cents, within the zone that market forces would not police. Moreover, the point at which a competing bidder would intervene and provide a check against opportunism actually is higher, not only because a competing bidder would incur expenses of its own to make the competing bid, but also because TransCanada had an open-ended match right. As a result of TransCanada's open-ended match right, a competing bidder would have to anticipate that TransCanada would match any bid up to its reserve price. Unless a competing bidder believed that it placed a higher value on the Company than TransCanada (including synergies), the competing bidder would not have a viable path to success. Reasoning backward from that outcome, a competing bidder would not expend the funds

to intervene unless it thought it could outbid TransCanada, and market forces would not address the mispricing resulting from the fiduciary breach. *See Merion Cap. L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *24–25 (Del. Ch. Dec. 16, 2016).

The Appraisal Decision ultimately concluded that the post-signing market check validated the deal price as "a persuasive indicator of fair value," meaning as a persuasive indicator that the deal price represented an upper bound on the Company's standalone value. *Appraisal Decision*, 2019 WL 3778370, at *42. When evaluating the sale process and when viewing the petitioners' objections individually and collectively, the court considered the sale process from this perspective, which is the court's function in an appraisal proceeding. The court did not consider whether the officers breached their duties in a manner that undercut the Board's negotiating leverage and resulted in TransCanada paying less than it otherwise would have. To the contrary, the court cited evidence indicating that loyal negotiators could have bargained for more by extracting a greater share of the synergies from TransCanada. *See id.* at *44–45.

Viewed through the lens of *stare decisis*, the Appraisal Decision does not support a pleading-stage dismissal of the plaintiffs' claims. The Appraisal Decision neither addressed nor resolved the theory of the case that the plaintiffs advance.

### 7. The Complaint's Allegations Support An Inference Of Fiduciary Breach.

At the pleading stage, it is reasonably conceivable that "the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision" fell outside the range of reasonableness. *QVC*, 637 A.2d at

45. It is reasonably conceivable that as a result of a flawed process, the Merger did not yield "the best value reasonably available to the stockholders." *Id.* at 43.

## B. The Damages Claim Against Skaggs And Smith

When applying enhanced scrutiny, Delaware law distinguishes between "the transactional justification" setting and the "personal liability" setting.[19] "Delaware courts routinely apply enhanced scrutiny in the transactional justification setting to evaluate the question of breach when determining whether to enjoin a transaction from closing pending trial." *Presidio*, 2021 WL 298141, at *19 (collecting authorities). Delaware courts likewise apply enhanced scrutiny after trial to determine whether to issue equitable relief that operates on a transactional basis, such as a mandatory injunction, a permanent prohibitive injunction, rescission, or an equitable reformation of or modification to the transaction's terms. *See id.* (collecting authorities).

---

[19] *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1374–75 (Del. 1995) (distinguishing between the "transactional justification" setting, in which enhanced scrutiny applies, and "personal liability" setting, in which the business judgment rule applies); *see Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1284 n.32 (Del. 1989) (distinguishing between "the traditional concept of protecting the decision itself" and the question of the "directors' personal liability for these challenged decisions"); *Revlon*, 506 A.2d at 180 n.10 (embracing the "distinction between the business judgment rule, which insulates directors and management from personal liability for their business decisions, and the business judgment doctrine, which protects the decision itself from attack" and noting that in "transactional justification cases," Delaware decisions had not observed the distinction in terminology, but nevertheless "may be understood to embrace the concept of the doctrine"); *see also Kahn v. Stern*, 2018 WL 1341719, at *1 n.3, 183 A.3d 715 (Del. Mar. 15, 2018) (ORDER) ("*Revlon* remains applicable [in a post-closing case] as a context-specific articulation of the directors' duties but directors may only be held liable for a non-exculpated breach of their *Revlon* duties.").

In a setting where enhanced scrutiny applies, establishing a breach of duty under the enhanced scrutiny standard is necessary but not sufficient to impose personal liability against a fiduciary. "Although the *Revlon* doctrine imposes enhanced judicial scrutiny of certain transactions involving a sale of control, it does not eliminate the requirement that plaintiffs plead sufficient facts to support the underlying claims for a breach of fiduciary duties in conducting the sale." *Malpiede*, 780 A.2d at 1083–84. "The fact that a corporate board has decided to engage in a change of control transaction invoking so-called *Revlon* duties does not change the showing of culpability a plaintiff must make in order to hold the directors liable for monetary damages." *McMillan v. Intercargo Corp.*, 768 A.2d 492, 502 (Del. Ch. 2000).

"When assessing personal liability, a court must determine whether the fiduciary breached either the duty of loyalty, including its subsidiary element of good faith, or the duty of care." *Presidio*, 2021 WL 298141, at *20 (collecting authorities). A plaintiff can recover monetary damages for a breach of the duty of loyalty only by proving that the fiduciary "harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party . . . , or [otherwise] acted in bad faith."[20] When enhanced scrutiny applies, a plaintiff must plead and later prove that the fiduciary failed to act reasonably to obtain the best value reasonably available due to interestedness, because of

---

[20] *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015); *see In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018); *Venhill Ltd. P'ship v. Hillman*, 2008 WL 2270488, at *22 (Del. Ch. June 3, 2008); *McMillan*, 768 A.2d at 502.

a lack of independence, or in bad faith. *USG*, 2020 WL 5126671, at *29; *see McMillan*, 768 A.2d at 502.

A plaintiff can recover monetary damages for a breach of the duty of care only by establishing that the fiduciary was grossly negligent.[21] In the corporate context, gross negligence means "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[22] When enhanced scrutiny

---

[21] *Singh v. Attenborough*, 137 A.3d 151, 151 (Del. 2016) (ORDER) ("Absent a stockholder vote and absent an exculpatory charter provision, the damages liability standard for an independent director or other disinterested fiduciary for breach of the duty of care is gross negligence, even if the transaction was a change-of-control transaction."); *RBC*, 129 A.3d at 857 ("When disinterested directors themselves face liability, the law, for policy reasons, requires that they be deemed to have acted with gross negligence in order to sustain a monetary judgment against them."); *McMillan*, 768 A.2d at 505 n.56 (asserting in a case involving a post-closing damages claim that "[i]n the absence of the exculpatory charter provision, the plaintiffs would still have been required to plead facts supporting an inference of gross negligence in order to state a damages claim"); *see Corwin*, 125 A.3d at 312 (noting that the range-of-reasonableness standard under enhanced scrutiny "do[es] not match the gross negligence standard for director due care liability under *Van Gorkom*").

[22] *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607 (Del. Ch. Apr. 5, 1990) (internal quotation marks omitted); *see Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) ("Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." (internal quotation marks omitted)). Gross negligence in the corporate context thus means conduct that goes beyond the various species of negligence and requires a showing of recklessness. By contrast, in civil cases not involving business entities, the Delaware Supreme Court has defined gross negligence as "a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'" *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1999) (quoting W. Prosser, *Handbook of the Law of Torts* 150 (2d ed. 1955)), *cert. denied*, 499 U.S. 952 (1991). Outside of the corporate context, gross negligence "signifies more than ordinary inadvertence or inattention," but it is "nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm." *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987).

applies, a plaintiff must plead and later prove that when failing to obtain the best value reasonably available, a non-exculpated fiduciary acted recklessly. For an exculpated fiduciary, the care claim is irrelevant. *Corwin*, 125 A.3d at 312.

For the reasons discussed above, enhanced scrutiny provides the standard of review for evaluating the Merger, and this decision has held that the Complaint pleads facts sufficient to state a claim for breach of duty by supporting a reasonable inference that the Merger and the process that led to it fell outside the range of reasonableness. The next question is whether the Complaint has pled a viable claim for damages against a fiduciary defendant, where "an allegation implying that a Defendant failed to satisfy *Revlon* is insufficient." *USG*, 2020 WL 5126671, at *2.

### 1. The Claim For Damages Against Skaggs and Smith In Their Capacities As Officers

The Complaint's allegations state a claim for money damages against Skaggs and Smith as officers. Under *Gantler v. Stephens*, the standards that govern a claim for a breach of the duty of loyalty against an officer are the same as the standards that govern a similar claim against a director. 965 A.2d 695, 708–09 (Del. 2009). At the pleading stage, it is reasonably conceivable that Skaggs and Smith breached their duty of loyalty by tilting the sale process in favor of TransCanada for self-interested reasons.

---

The reality that a care claim requires recklessness warrants re-conceptualizing what exculpation accomplishes. Exculpation does not eliminate liability for negligence, because that form of liability does not exist in the first place. In the corporate context, a breach of the duty of care requires recklessness. The real function of exculpation is to eliminate liability for recklessness.

107

The defendants argue that the Complaint cannot state a claim unless it pleads a non-exculpated claim against a majority of the Board. Dkt. 40 at 41–43. That argument misunderstands Delaware law. "A plaintiff need not allege that a majority of the board committed a non-exculpated breach . . . in order to state a claim against a disloyal CEO." *Xura,* 2018 WL 6498677, at *13. A plaintiff can plead a claim against an officer by showing that the officer committed a fraud on the board by withholding material information from the directors that would have affected their decision-making or by taking action that materially and adversely affected the sale process without informing the board.[23]

---

[23] *See Haley*, 235 A.3d at 723–24 (holding that complaint stated claim against target's CEO and lead negotiator who failed to inform the board that he had received a proposed compensation package from the acquirer); *RBC*, 123 A3d at 865 (explaining that trial court's award of money damages against financial advisor "was premised on [the financial advisor]'s 'fraud on the Board'"); *Technicolor Plenary III*, 663 A.2d at 1170 n.25 ("[T]he manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body."); *Macmillan*, 559 A.2d at 1283–84 & n.33 (describing knowing silence of management and financial advisor about a tip as "a fraud upon the Board"); *Mindbody*, 2020 WL 5870084, at *24–25 (holding that complaint stated claim against CEO for fraud on the board where CEO failed to inform board about his efforts to kick-start a sale process and then guide the deal to his favored bidder); *Del Monte*, 25 A.3d at 836 (holding that investment bank's knowing silence about its buy-side intentions, its involvement with the successful bidder, and its violation of a no-teaming provision misled the board); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1069 (Del. Ch. 2004) (holding if directors were "purposely duped," then there "was fraud on the board" and the directors' actions were subject to equitable challenge), *aff'd*, 872 A.2d 559 (Del. 2005); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999) (holding that two directors were guilty of fraud on the board where they kept the self-interest of one of them in certain transactions being considered by the board secret from the rest of the board); *see also In re Am. Int'l Gp., Inc. Consol. Deriv. Litig*. 965 A.2d 763, 806–07 (Del. Ch. 2009) ("In colloquial terms, a fraud on the board has long been a fiduciary violation under our law and typically involves the failure of insiders to come clean to the independent directors about their own wrongdoing, the wrongdoing of other insiders, or information that the insiders fear will be used by the independent directors to take actions

In *Xura*, the complaint alleged that a CEO met privately with representatives of a private equity firm to discuss the terms of the firm's buyout proposal, first during a lunch meeting and subsequently during a dinner meeting. 2018 WL 6498677, at *2. The CEO also engaged in other communications with the private equity firm. In a lawsuit challenging the eventual transaction, the court held that the complaint stated a claim for breach of fiduciary duty against the CEO and that the Board's lack of knowledge about the full scope of the CEO's activities meant that the disinterestedness and independence of a majority of the other directors could not defeat the claim. *Id.* at *13.

For purposes of the claim for breach of fiduciary duty in their capacity as officers of Columbia, the Complaint supports a reasonable inference that Skaggs and Smith impaired the sale process through their interactions with TransCanada, including through the January 7 Meeting, that they did so for self-interested reasons, and that the Board was not informed sufficiently about their activities to defeat the claim. To defeat each step in this chain of inference, the defendants return yet again to the Appraisal Decision.

First, to defeat the inference that Skaggs and Smith impaired the sale process, the defendants cite the finding in the Appraisal Decision that the petitioners there failed to show that additional competition would have changed the result. *See, e.g.*, *Appraisal Decision*, 2019 WL 3778370, at *29. As discussed, the court made this finding for the purpose of evaluating the deal price against standalone value. The court recognized that

---

contrary to the insiders' wishes."). *See generally* Joel Edan Friedlander*, Confronting the Problem of Fraud on the Board*, 75 Bus. Law. 1441 (2020).

there was evidence that the Board might have extracted a higher price from TransCanada without Smith's tip, concluding only that the prospect of a higher deal price was "insufficient to undermine the deal price for appraisal purposes." *Id.*

Next, to defeat the inference that Skaggs and Smith wanted to retire and focused on their change-in-control benefits, the defendants point to the court's observation in the Appraisal Decision that "[a]lthough Skaggs and Smith wanted to retire, they were professionals who took pride in their jobs and wanted to do the right thing. They were not going to arrange a fire sale for below Columbia's standalone value, and the Board would not have let them." *Id.* at *28. As noted previously, this finding only determined that Skaggs and Smith "were not going to arrange a fire sale *for below Columbia's standalone value*," which was the issue in the Appraisal Decision. At the pleading stage, the finding supports the plaintiffs' claims by determining that "Skaggs and Smith wanted to retire."

Last, to defeat the inference that Skaggs and Smith failed to keep the Board informed, the defendants quote selectively from the Appraisal Decision, claiming that this court found that there was no "fraud on the board" and that "[t]he Board received a steady flow of information" and was not "misled or deprived of material information." *Id.* at *33– 34. The Appraisal Decision did find that the Board "received a steady flow of information, with Skaggs regularly keeping the directors informed through written memos, presentations during meetings, and one-on-one communications." *Id.* at *33. But the court found that Skaggs and Smith had not been fully candid with the Board about the January 7 Meeting or their related dealings with TransCanada and agreed that this was a "flaw in the process." *Id.* at *33–34. Although the court rejected the argument that Skaggs' and Smith's

110

activities led to a price below Columbia's standalone value, the Appraisal Decision did not address the possibility that their activities undermined the Company's ability to extract a higher price from TransCanada or another bidder.

### 2. The Claim For Damages Against Skaggs His Capacity As A Director

The Complaint's allegations also state a claim for money damages against Skaggs in his capacity as a director. The analysis tracks the claim against him in his capacity as an officer. The claim against Skaggs as a director arguably is superfluous; Skaggs seems principally to have acted as an officer during the course of the sale process, and his primary exposure lies in that capacity.

The principal difference between the two theories of recovery is the potential availability of exculpation for Skaggs in his capacity as a director. But because the Complaint pleads a claim for breach of the duty of loyalty against Skaggs, he is not entitled to exculpation. *See* 8 *Del. C.* § 102(b)(7). The analysis of the claim against Skaggs as a director therefore tracks the claim against him as an officer.

### C. The Claim For Damages Against TransCanada

The Complaint pleads a claim for damages against TransCanada for aiding and abetting breaches of fiduciary duty. To plead a reasonably conceivable claim, the Complaint must allege facts addressing four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by a non-fiduciary defendant, and (iv) damages proximately caused by the breach. *Malpiede*, 780 A.2d at 1096. Although a claim against an acquirer for aiding and abetting

is difficult to plead and prove, it is reasonable to infer that TransCanada knew that Skaggs and Smith acted wrongfully and exploited their conflicts.

The first two elements of the claim are pled easily. Skaggs and Smith were officers who, like directors, "owe fiduciary duties of care and loyalty." *Gantler*, 965 A.2d at 708–09. As discussed, the Complaint pleads facts supporting a reasonable inference that Skaggs and Smith breached their fiduciary duties when engaging in a sale process that fell short under enhanced scrutiny, which is the standard for evaluating breach for purposes of an aiding and abetting claim. *Presidio*, 2021 WL 298141, at *38 (citing *RBC*, 129 A.3d at 857, and *Singh*, 137 A.3d at 153). This decision already has concluded that the Complaint states a claim that the sale process fell outside the range of reasonableness for purposes of enhanced scrutiny. The third and fourth elements warrant more detailed discussion.

### 1. Knowing Participation In The Breach

The critical element for an aiding-and-abetting claim is the defendant's knowing participation in the breach. This element protects the alleged aider and abettor by ensuring that the alleged aider and abettor still will not face potential liability absent pled facts that support an inference of *scienter*. *See Singh*, 137 A.3d at 152–53. "[T]he requirement that the aider and abettor act with *scienter* makes an aiding and abetting claim among the most difficult to prove." *RBC*, 129 A.3d at 865–66.

The element of knowing participation involves two concepts: knowledge and participation. To establish knowledge, "the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper." *RBC*, 129 A.3d at 862 (internal quotation marks omitted). "[T]he question of whether a

defendant acted with *scienter* is a factual determination." *Id.* Under Rule 9(b), a plaintiff can plead knowledge generally; "there is no requirement that knowing participation be pled with particularity." *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *17 (Del. Ch. June 30, 2014). For purposes of a motion to dismiss under Rule 12(b)(6), a complaint need only plead facts supporting a reasonable inference of knowledge. *See id.*; *see also Wells Fargo & Co. v. First Interstate Bancorp*, 1996 WL 32169, at *11 (Del. Ch. Jan. 18, 1996) (Allen, C.) ("[O]n the question of pleading knowledge, however, Rule[] 12(b)(6) and Rule 9(b) are very sympathetic to plaintiffs.").

To satisfy the requirement of knowing participation, a plaintiff can plead that the third party "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue." *Malpiede*, 780 A.2d at 1098. In particular, a third party can participate in a fiduciary breach by facilitating or inducing a breach of the duty of care. *PLX*, 2018 WL 5018535, at *48. A third party may facilitate a breach by misleading the fiduciary with false or materially misleading information.[24] Or a third party

---

[24] *See Goodwin v. Live Ent., Inc.*, 1999 WL 64265, at *28 (Del. Ch. Jan. 25, 1999) (granting summary judgment in favor of defendants charged with aiding and abetting a breach of the duty of care but suggesting that such a claim could proceed if "third-parties, for improper motives of their own, intentionally duped the Live directors into breaching their duty of care"); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 322 n.3 (Del. Ch. 2013) (noting that "a non-fiduciary aider and abetter" could be exposed to liability "if, for example, the non-fiduciary misled unwitting directors to achieve a desired result").

can facilitate a breach by withholding information in a manner that misleads the fiduciary on a material point.[25]

Consistent with these principles, the *Restatement (Second) of Torts* explains that a defendant can be secondarily liable for "harm resulting . . . from the tortious conduct of another" if the defendant

> (a)  does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b)  knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

---

[25] *See Macmillan*, 559 A.2d at 1283–84, 1284 n.33 (describing management's knowing silence about a tip as "a fraud upon the Board"); *FrontFour Cap. Gp. LLC v. Taube*, 2019 WL 1313408, at *26 (Del. Ch. Mar. 11, 2019) ("In the events leading up to the Proposed Transactions, the Taube brothers created an informational vacuum, which they then exploited."); *Mesirov v. Enbridge Energy Co.*, 2018 WL 4182204, at *13–16 (Del. Ch. Aug. 29, 2018) (sustaining claim for aiding and abetting against financial advisor for preparing misleading analyses and creating an informational vacuum that misled board); *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *25–27 (Del. Ch. Oct. 20, 2015) (same); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *48 (Del. Ch. Sept. 4, 2014) (holding that interested director aided and abetted breach of duty by failing to explain valuation adequately, thereby misleading the board), *aff'd sub nom. Fuchs v. Wren Hldgs., LLC*, 129 A.3d 882 (Del. 2015) (ORDER); *Rural Metro*, 88 A.3d at 99 (holding that investment banker knowingly participated in board's breach of duty where "RBC *created* the unreasonable process and informational gaps that led to the Board's breach of duty"); *Del Monte*, 25 A.3d at 836–37 (holding that investment bank's knowing silence about its buy-side intentions, its involvement with the successful bidder, and its violation of a no-teaming provision misled the board); *cf. Technicolor Plenary III*, 663 A.2d at 1170 n.25 ("[T]he manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body."); *El Paso*, 41 A.3d at 443 ("Worst of all was that the supposedly well-motivated and expert CEO entrusted with all the key price negotiations kept from the Board his interest in pursuing a management buy-out of the Company's E & P business.").

(c)    gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Restatement (Second) of Torts* § 876 (1979). A comment on clause (b) states: "If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act." *Id.* cmt. d. Under the *Restatement*, giving "substantial assistance or encouragement" to the fiduciary in breaching its duty is sufficient to satisfy the participation requirement.

"A third-party bidder who negotiates at arms' length rarely faces a viable claim for aiding and abetting." *Del Monte*, 25 A.3d at 837. The general rule is that "arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting." *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010). The pleading burden to establish knowing participation against a third-party acquirer accordingly is high. A difficult pleading standard "aids target stockholders by ensuring that potential acquirors are not deterred from making bids by the potential for suffering litigation costs and risks on top of the considerable risk that already accompanies [a transaction]." *Id.*

A high pleading standard, however, is not an insuperable one. The pled facts support a pleading-stage inference that TransCanada knew that Skaggs and Smith were breaching their fiduciary duties and sought to take advantage of the situation. The constellation of allegations that supports this inference includes TransCanada's repeated violations of its standstill agreement, Smith's extreme behavior during the January 7 Meeting, Skaggs' decision to treat TransCanada as if its exclusivity agreement remained in effect even after

115

it had terminated, the "moral commitment" that Skaggs and Smith gave TransCanada not to consider anything less than a fully financed offer, and TransCanada's last-minute lowering of its bid.

Viewed in isolation, none of these incidents would support a claim for aiding and abetting. Taken together, they support a pleading stage inference that TransCanada knew that Skaggs and Smith were compromised. This decision has detailed at length how Skaggs and Smith favored TransCanada. Evidencing its understanding of their situation, TransCanada extracted a "moral commitment" from Skaggs and Smith that the phrase "serious written proposal" meant a "financed bid subject only to confirmatory" diligence. Compl. ¶ 108. TransCanada then again took advantage of Skaggs' and Smith's compromised position by lowering its offer from $26 to $25.50, combined with a three-day deadline and a threat to publicly announce the breaking off of talks if the Company did not accept.

At the pleading stage, it is reasonable to infer that TransCanada sought to take advantage of the situation that it had worked with Skaggs and Smith to create. For pleading purposes, the constellation of facts present in this case supports an inference of knowing participation.

### 2. Damages

Finally, a claim for aiding and abetting also requires that the Complaint plead the existence of damages. At the pleading stage, a plaintiff need not specify a monetary amount. The plaintiff can plead the existence of damages generally as long as the Complaint supports a reasonable inference of harm. *See, e.g.*, *In re EZCORP Inc.*

116

*Consulting Agr. Deriv. Litig.*, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016); *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 19 (Del. Ch. 2009). The Complaint supports a reasonable inference that the stockholders lost out on a higher valued transaction due to the actions that Skaggs, Smith, and TransCanada took, which is sufficient at the pleading stage.

In response, the defendants return to the Appraisal Decision and argue that the Company's stockholders could not have suffered damages if they received an amount that this court found to be the standalone value of the Company. That damages remedy is not what the plaintiffs are seeking. They contend that stockholders lost out on the difference between the $25.50 that they received and the higher amount that TransCanada or another bidder would have paid. "If the plaintiffs prove that the defendants could have sold the corporation to the same or to a different acquirer for a higher price, then the measure of damages should be based on the lost transaction price."[26] The plaintiffs have articulated a

---

[26] *PLX*, 2018 WL 5018535, at *51; *see In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *46 (Del. Ch. Aug. 27, 2015) (awarding damages of $2.74 per share, which suggested that "Murdock and Carter's pre-proposal efforts to drive down the market price and their fraud during the negotiations reduced the ultimate deal price by 16.9%"); *Gray*, 749 A.2d at 117 (finding that although price fell within lower range of fairness, "[t]he defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage"); *see also Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184–85 (Del. Ch. 1999) (holding that although the "uncertainty [about] whether or not ITI could secure financing and restructure" lowered the value of the plaintiffs' shares, the plaintiffs were entitled to a damages award that reflected the possibility that the company might have succeeded absent the fiduciary's disloyal acts), *aff'd*, 766 A.2d 437 (Del. 2000).

viable theory of damages and have pled all of the elements of a claim for aiding and abetting a breach of fiduciary duty.[27]

## V. THE DISCLOSURE CLAIMS

In addition to the sale process claims, the plaintiffs contend that Skaggs and Smith breached their duty of disclosure. The plaintiffs maintain that TransCanada knowingly participated in Skaggs' and Smith's breaches of the duty of disclosure, exposing TransCanada to liability for aiding and abetting.

### A. The Disclosure Claim Against Skaggs And Smith

As officers, Skaggs and Smith owed fiduciary duties that were "the same as those of directors." *Gantler*, 965 A.2d at 709. Directors owe a "fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action," as when requesting stockholder approval for a merger. *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992). The same duty applies to officers. *See, e.g.*, *City of Warren Gen. Empls.'*

---

[27] The plaintiffs separately have alleged that TransCanada was unjustly enriched because it was able to acquire the Company on the cheap. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (internal quotation marks omitted). "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). Unless TransCanada engaged in wrongful conduct, such as by aiding and abetting a breach of fiduciary duty, TransCanada was entitled to seek to negotiate the best deal it could for itself. The plaintiffs have not identified any separate basis on which unjust enrichment might need to be employed to prevent injustice. The claim for unjust enrichment therefore is dismissed.

*Ret. Sys. v. Roche*, 2020 WL 7023896, at \*19–23 (Del. Ch. Nov. 30, 2020); *In re Baker Hughes, Inc. Merger Litig.*, 2020 WL 6281427, at \*15–16 (Del. Ch. Oct. 27, 2020).

When seeking injunctive relief for a breach of the duty of disclosure in connection with a request for stockholder action, a plaintiff need only show a material misstatement or omission. When seeking post-closing damages for a breach of the duty of disclosure, however, the plaintiffs must prove quantifiable damages that are "logically and reasonably related to the harm or injury for which compensation is being awarded." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006).

The duty of disclosure arises because of "the application in a specific context of the board's fiduciary duties." *Malpiede*, 780 A.2d at 1086. The "duty of disclosure is not an independent duty, but derives from the duties of care and loyalty." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (internal quotation marks omitted). A plaintiff that seeks to recover damages for a breach of the duty of disclosure also must establish that the fiduciary acted with "a culpable state of mind" or engaged in "non-exculpated gross negligence." *Wayport*, 76 A.3d at 315.

The first step in pleading a claim for damages for breach of the duty of disclosure is to plead facts supporting an inference that the fiduciary failed to disclose material information. The Appraisal Decision determined that for purposes of Delaware law, the Proxy failed to disclose material information. This decision already has held that the Complaint supports a pleading-stage inference of three disclosure violations.

To support a damages claim, the plaintiffs next must plead facts supporting an inference that Skaggs or Smith withheld the information knowingly or because of non-

119

exculpated gross negligence. Under this standard, the claims against Skaggs and Smith are not subject to dismissal. It is reasonably conceivable that their interest in early retirement and the benefits conferred by the Merger tainted their decisions about what to disclose, supporting a reasonable inference that their failure to disclose information resulted from a breach of the duty of loyalty. *See Orman v. Cullman*, 794 A.2d 5, 41 (Del. Ch. 2002) (refusing to find defendants who "decided what information to include in the Proxy" only breached their duty of care where the complaint sufficiently pled that they were conflicted). The disclosure violations also concerned Skaggs' and Smith's own actions, supporting an inference that they knew the Proxy was false when issued. The Complaint therefore supports a reasonable inference that Skaggs and Smith breached the subsidiary element of the duty of loyalty by failing to act in good faith. *See In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3030808, at *11 (Del. Ch. June 18, 2018) (finding it reasonably conceivable that a fiduciary "breached his duty of loyalty by allowing the Proxy to go to stockholders" where complaint's allegations supported a reasonable inference that the fiduciary "knew the Proxy was materially misleading"). At a minimum, the Complaint supports a reasonable inference that Skaggs and Smith acted recklessly. Because they are not entitled to exculpation in their capacities as officers, the Complaint therefore states claims against them. *See Roche*, 2020 WL 7023896, at *19–23 (denying motion to dismiss breach of fiduciary duty claim seeking compensatory damages against officer for disclosures in proxy statement); *Baker Hughes*, 2020 WL 6281427, at *15–16 (same).

The Complaint also satisfies the remaining elements of a claim for breach of the duty of disclosure. At the pleading stage, the Complaint need not prove "actual reliance on

the disclosure, but simply that there was a material misdisclosure." *Metro Commc'n Corp. BVI v. Adv. Mobilecomm Techs. Inc.*, 854 A.2d 121, 156 (Del. Ch. 2004). "The Complaint need not plead that omissions or misleading disclosures were so material that they would cause a reasonable investor to change his vote." *Roche*, 2020 WL 7023896, at *24. By pleading that the disclosures were materially misleading, the plaintiffs have pled a claim that satisfies the elements of reliance and causation.

Finally, the Complaint also adequately pleads damages. Ordinarily, a plaintiff can plead damages generally, and with further "consideration of damages await[ing] a developed record." *Morrison v. Berry*, 2019 WL 7369431, at *22 n.273 (Del. Ch. Dec. 31, 2019). In light of the Appraisal Decision, the defendants argue that the plaintiffs cannot prove damages under a quasi-appraisal theory, because the court already has held that the deal price exceeded standalone value. If the plaintiffs only sought quasi-appraisal as a remedy, then the Appraisal Decision would provide persuasive authority that damages did not exist under the doctrine of *stare decisis*. *See PLX*, 2018 WL 5018535, at *50–51.

In this case, however, the plaintiffs are not seeking quasi-appraisal damages. They are seeking rescissory damages, which can be awarded for fraud or for a disloyal breach of the duty of disclosure. *See Orchard Enters.*, 88 A.3d at 40 (Del. Ch. 2014); *Turner v. Bernstein*, 768 A.2d 24, 39 (Del. Ch. 2000). The plaintiffs also are not necessarily seeking broad rescissory damages on a transaction-wide basis; they have identified disgorgement of transaction-related benefits as one possible form of rescissory remedy. The defendants argue that rescissory damages could never be awarded on these facts, but it is premature to make that determination at this stage. *See Orchard Enters.*, 88 A.3d at 41–42 (declining to

121

rule out rescissory damages on motion for summary judgment). If the plaintiffs proved that Skaggs or Smith knowingly misrepresented facts in the Proxy, then a rescissory award might be available.

## B. The Aiding-And-Abetting Claim Against TransCanada

The plaintiffs maintain that TransCanada aided and abetted the breaches of the duty of disclosure committed by Skaggs and Smith. Because the Complaint pleads viable claims for breach against Skaggs and Smith, the only element in dispute is knowing participation.

The disclosure violations in this case included the omissions regarding the January 7 Meeting and TransCanada's breaches of its own DADW standstill. Under the Merger Agreement, TransCanada and its affiliates were obligated to "furnish all information concerning themselves and their Affiliates that is required to be included in the Proxy Statement." MA § 5.01(a). They further agreed that

> none of the information supplied by each of them or any of their respective Subsidiaries (as applicable) for inclusion or incorporation by reference in the Proxy Statement will, at the date of mailing to stockholders of the Company or at the time of the Stockholders Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

*Id.* TransCanada and its affiliates thus were obligated to furnish accurate and complete information for inclusion in the Proxy. TransCanada also undertook an obligation to inform the Company if there was any issue in the Proxy that needed to be addressed

> so that the Proxy Statement or the other filings shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

122

*Id.* § 5.01(b).

Two of the disclosure violations concern TransCanada's breaches of the DADW standstills and its interactions with Skaggs and Smith in connection with the January 7 Meeting. TransCanada necessarily knew about its own conduct. TransCanada was contractually obligated to take action so that the Proxy did not contain untrue or materially misleading statements of fact.

Under the circumstances, it is reasonable to infer at this stage that TransCanada knowingly participated in the material omissions in the Proxy that concerned TransCanada's own conduct. The Complaint therefore states a claim against TransCanada for aiding and abetting these disclosure violations.

## VI.     CONCLUSION

The Complaint pleads claims for breach of fiduciary duty against Skaggs and Smith. It pleads a claim for aiding and abetting breaches of fiduciary duty against TransCanada. The defendants' motion to dismiss is therefore denied.